[No. A019434. First Dist., Div. Three. Nov. 24, 1986.]

TRAVELERS INSURANCE COMPANY et al.,
Plaintiffs, Cross-defendants and Appellants, v.
DEAN S. LESHER et al.,
Defendants, Cross-complainants and Appellants.

178

## Counsel

Ropers, Majeski, Kohn, Bentley & Wagner, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Michael J. Brady, Gail Y. Norton, David O. Larson and Moore, Clifford, Wolfe, Larson & Trutner for Plaintiffs, Cross-defendants and Appellants.

Thomas W. Kemp, Laurel C. Lalanne, David Ivester and Washburn & Kemp for Defendants, Cross-complainants and Appellants.

## Opinion

**SCOTT, J.**—A jury awarded an insured $1.5 million for damages resulting from an insurer's improper conduct of a defense undertaken under a reservation of rights. The jury also awarded $1.5 million in punitive damages. Although we conclude that the insurer had no duty to defend or indemnify under the terms of the policy, we also conclude that the evidence in this unusual case was sufficient to support the compensatory damage award. The award of punitive damages is not supported by substantial evidence and must be reversed.

### Introduction

Dean S. Lesher (Lesher) and others were named as defendants in actions alleging violations of antitrust law. Lesher tendered the defense of these actions to his general liability insurer, Travelers Indemnity Company and Travelers Insurance Company (Travelers). Travelers agreed to defend under a reservation of rights; it also filed this declaratory relief action to establish that it had no duty to defend or indemnify Lesher and to obtain reimbursement for costs incurred in Lesher's defense.

In December 1978 one of the antitrust actions was settled. In January 1979 the trial court granted in part Travelers' motion for summary adjudication in the declaratory relief action, holding that the insurer had no duty

to defend or indemnify Lesher, but ordering a trial on Travelers' entitlement to fees and costs. In July 1979 Lesher filed a cross-complaint against Travelers and others for negligent misrepresentation, tortious breach of contract, and negligence. In September 1979 the second antitrust case was settled.

Jury trial was held on Travelers' claim for fees and on Lesher's cross-complaint. The court granted Lesher's motion for nonsuit on the fee claim. On the cross-complaint the jury found that Travelers breached the implied covenant of good faith and fair dealing, wrongfully refused or failed to defend Lesher, and violated Insurance Code section 790.03. The jury awarded Lesher $1.5 million in compensatory and $1.5 million in punitive damages.

Travelers appeals from the order of nonsuit and from the judgment on the jury verdict. It complains of instructional error and error in the admission and exclusion of evidence. It also contends there is no substantial evidence of proximately caused damage to Lesher or of conduct which would justify the award of punitive damages. Lesher has cross-appealed from the order of summary adjudication, contending that the policy exclusion on which the trial court relied was ineffective because it was inconspicuous and ambiguous.

### Statement of Facts

Lesher is the president and a majority stockholder in East Bay Newspapers, Inc., and is also a shareholder in California Delta News. Each of those entities publishes newspapers and "shoppers" in Contra Costa County. Lesher is also president of Lesher Newspapers, Inc., which publishes papers in Merced and Atwater.

Lesher carried a general liability insurance policy with a $500,000 policy limit on these businesses through Travelers. He also had a comprehensive catastrophe liability policy with U.S. Fire.

Lesher and others were sued in three separate lawsuits between February 1976 and March of 1977. The Worrell plaintiffs alleged in a federal court action that Lesher had attempted to drive their newspaper, the Pittsburg Post Dispatch, out of business by hiring away its employees, purchasing the Pittsburg Press, and using improper discount advertising rates. The Diablo Valley plaintiff alleged in both state and federal court that Lesher, through predatory conduct, had attempted to drive its Wednesday Shopper out of business. Lesher tendered the defense of the Worrell and the Diablo Valley actions to Travelers.

Travelers accepted the defenses under a reservation of rights. It initially disclaimed coverage on the ground that the complaints alleged intentional acts, which were not covered by the policy. Several months later Travelers notified Lesher that it also denied coverage based on an exclusion in the policy.

Travelers appointed the personal injury defense firm of O'Connor, Cohn, Dillon & Barr to represent Lesher in the antitrust actions. This firm apparently was not experienced in business litigation. When the O'Connor firm failed to make an appearance on Lesher's behalf, Kurt Melchior of Severson, Werson, Berke & Melchior, acting as Lesher's personal attorney, obtained an extension of time in which to respond to the Worrell complaint. Melchior acted as Lesher's personal attorney throughout the litigation of the underlying cases. He "shadowed" the defense provided to Lesher, in order to be able to assume Lesher's defense should Travelers decide to withdraw.

Melchior notified Travelers that in his opinion, the O'Connor firm was not equipped to handle Lesher's antitrust defense properly. Travelers replaced the O'Connor firm with the firm of Farella, Braun & Martel (Farella). Lesher understood that Jerome Braun, a senior partner, would conduct the trial while Gary Anderson, another partner, would prepare the case for trial. As time passed, Lesher became increasingly disenchanted with the defense provided him by Anderson. When he learned that Anderson rather than Braun was scheduled to try the Worrell case, he requested that Anderson be replaced with a more experienced lawyer. Farella agreed to have Richard Bryan, another senior partner, try the case.

In August 1977 Melchior requested that Anderson attempt to negotiate a settlement with the Diablo Valley plaintiff. Anderson replied that he could not participate in settlement negotiations without authorization from both Lesher and Travelers. Travelers never authorized Anderson to negotiate a settlement, and he did not participate in any settlement discussions with the Worrells on behalf of Lesher. Anderson did contact counsel for the Diablo Valley plaintiffs, who stated he was not interested in a nuisance value settlement but might submit a demand. Anderson called plaintiffs' counsel several times thereafter, but the calls were not returned.

Travelers turned down requests from Lesher that it participate in proposed settlements of the Worrell action. In April 1978 the Worrells offered to settle the case for $1.2 million. Lesher refused this offer, and the action proceeded to trial, but a mistrial was declared on the second day of jury selection. Trial was eventually continued to January 3, 1979.

In the meantime, in July 1977 Travelers had filed the instant action for declaratory relief and hired the firm of Long & Levit to represent it in that

action. Although Travelers apparently attempted to segregate its handling of the declaratory relief questions from the defense of Lesher in the underlying actions, evidence was adduced at trial that it was not completely successful in this undertaking.

In March 1978 Travelers moved for summary judgment in the declaratory relief action. In April 1978 the trial court (Judge Calhoun) issued a notice of decision granting the motion. The court found that Travelers had no obligation to defend or indemnify Lesher, and that it was entitled to reasonable attorney's fees according to proof. In June 1978 Travelers noticed a "Motion for Determination of Attorney Fees and Expenses in Accord with Prior Court Order," etc. It attached an affidavit by Braun, one of Lesher's attorneys at Farella, attesting the accuracy of 63 pages of bills Farella had submitted to Travelers in the Worrell and Diablo Valley actions. Neither Braun nor Travelers reviewed the bills before they were filed in the declaratory relief action, and the name of at least one potential witness in the antitrust cases was inadvertently disclosed therein.

Lesher subsequently filed a counteraffidavit attacking the reasonableness of the bills. Both Braun's and Lesher's affidavits were served on the Worrells. There was testimony that Lesher's defense in the Worrell action was harmed by this information falling into the hands of the Worrells. Farella felt unable to continue representing Lesher because of his statements in his counteraffidavit, and requested permission to withdraw from his defense. Farella withdrew on July 28, 1978.

Lesher wrote Travelers in the beginning of August, asking whether it intended to appoint new counsel to represent him in the antitrust actions. In September Travelers replied, suggesting that Lesher hire his own attorney at Travelers' expense. Later that month, Melchior suggested that Travelers, rather than Lesher, ought to select new counsel. Travelers did not reply to Melchior's letter until the end of November.

By the time Travelers agreed to select new counsel, only five and one-half weeks remained before trial in the Worrell case. The court refused to continue the trial date. In late December 1978 Lesher accepted a settlement offered by the Worrells. He testified that he felt compelled to settle because his new attorney, Paul Renne, did not have sufficient time in which to prepare his case for trial. The Worrells were paid $1.2 million in settlement (U.S. Fire contributed $700,000 toward this settlement), and Lesher also purchased the assets of the Pittsburg Post Dispatch for $512,500 as part of the settlement. In addition, he paid $100,000 for a covenant not to compete.

In August 1978, during the period between the withdrawal of Farella and the appointment of Renne, Judge Calhoun withdrew his order of summary

judgment. Travelers renewed its motion, and in January 1979, after the Worrell action had settled, a second trial judge granted the motion in part, concluding that Travelers had no duty to indemnify or defend. It also directed that trial should be held on the questions of Travelers' entitlement to fees and costs, and the amount and reasonableness thereof.

In July 1979 Lesher filed a cross-complaint in the instant declaratory relief action, alleging tortious breach of contract, negligence, and negligent misrepresentation.

In August 1979 the Diablo Valley plaintiff contacted Lesher, and offered to settle its action for $390,000. Lesher eventually agreed to settle for $300,000. This action had been stayed earlier, and Melchior opined that the action could have been settled for between $20,000 and $50,000 while that stay was in effect.

*Lesher's Cross-appeal*

Judgment was entered in this case: (1) in favor of Travelers on its claim that it had no duty under the policy to defend or indemnify Lesher; (2) against Travelers on its claim for reimbursement of fees; and (3) in favor of Lesher on the jury verdicts. We first consider Lesher's cross-appeal on the issue of Travelers' duties under the policy. In granting summary adjudication in favor of Travelers, the trial court relied on an exclusionary clause in the policy. Lesher contends that the exclusionary clause was inapplicable because it was not conspicuous, that the language of the clause was ambiguous, and that triable issues of fact remain as to his coverage expectations.

It is axiomatic that any ambiguity in an insurance policy is to be resolved against the insurer. (*White* v. *Western Title Ins. Co.* (1985) 40 Cal.3d 870, 881 [221 Cal.Rptr. 509, 710 P.2d 309].) As a result of that fundamental principle, exclusionary clauses are interpreted narrowly against the insurer. (*State Farm Mut. Auto. Ins. Co.* v. *Partridge* (1973) 10 Cal.3d 94, 101-102 [109 Cal.Rptr. 811, 514 P.2d 123].) "An exclusionary clause must be conspicuous, plain and clear . . . ." (*Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089].) To be conspicuous, an exclusion must be positioned in a place and printed in a form which will attract the reader's attention. (*Ponder* v. *Blue Cross of Southern California* (1983) 145 Cal.App.3d 709, 719 [193 Cal.Rptr. 632].) To be plain and clear, the substance of the exclusion must be precise and understandable. "To be effective in this context, the exclusion must be couched in words which are part of the working vocabulary of average lay persons." (*Id.,* at p. 723.)

The first page of Lesher's policy lists the broad categories of insurance provided under its various sections and indicates that general liability insurance is afforded under section II. The first page also plainly states that the insurance afforded under a section is that set forth in the declarations, forms and endorsements made a part of the section.

Each page of section II begins with a boldfaced heading indicating both the section number and the content of the page (i.e., SECTION II COVERAGE DECLARATION). One of the section II coverage declarations states that coverage is afforded for various categories of injury, including "advertising injury" with a $500,000 coverage limit. The "SPECIAL GENERAL LIABILITY FORM" which is part of section II specifies what Travelers will pay for in each of those categories, and what is excluded from coverage. Two conspicuous boldfaced headings appear on the first page of that form: "A. INSURING AGREEMENTS" and "B. EXCLUSIONS." Under the first heading, the policy states, inter alia, that Travelers will pay sums which the insured shall become legally obligated to pay because of advertising injury. It defines advertising injury as "injury sustained by any person or organization because of libel, slander, piracy, unfair competition, idea misappropriation under an implied contract, or infringement of copyright, title or slogan, arising out of the *Named Insured's* advertising, promotional or publicity activities conducted during the policy period." As stated, the list of exclusions begins *on the same page.* While that list is long and extends over more than one page, the exclusion sections are organized in the same order as are the coverage sections: i.e., categories A and B are first, then category E, then category P, which includes advertising injury. The policy provides: "Coverage P does not apply: . . . with respect to advertising injury, to: . . . any *Insured,* if the *Named Insured* is engaged in the business of advertising, broadcasting, telecasting or publishing; . . ."

■ Despite the length and complexity of the policy, we conclude that the exclusions are positioned and printed to attract the reader's attention. They immediately follow the pertinent coverage sections, and are organized in the same manner. The exclusions are sufficiently conspicuous.

Next, Lesher contends that even if the exclusion is conspicuous, it is ambiguous. Lesher claims that the term "publishing" in this exclusion is ambiguous because his business was identified as "newspaper publishing" rather than "publishing" elsewhere in the policy.

■ Words used in an insurance policy are to be interpreted according to their plain meaning. "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628,

640 P.2d 764].) As Lesher himself noted in his opposition to the second motion for summary judgment, Webster's New Collegiate Dictionary (1973) defines "publishing" as "the business or profession of the commercial production and issuance of literature, information, musical scores or sometimes recording, or art—newspaper—microfilm." The exclusionary clause plainly conveys the insurer's intent not to provide coverage for advertising injuries if the insured is in any type of publishing business. The clause is not ambiguous.

■ Finally, Lesher contends that summary adjudication was improper because triable issues of fact exist as to his coverage expectations in light of the facts and circumstances surrounding the purchase of the policy, among other issues. However, unless there is ambiguity in the policy, the question of the insured's reasonable expectation of coverage is inapplicable. If there is no ambiguity in a policy, the court must give effect to its plain terms. (*Wolf Machinery Co.* v. *Insurance Co. of North America* (1982) 133 Cal.App.3d 324, 328 [183 Cal.Rptr. 695].) Only if a term is ambiguous does the court engage in construction of the policy. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920].)

The trial court properly ruled that Travelers had no duty to defend or to indemnify Lesher under the terms of the policy.

## Travelers' Appeal

As stated, the trial court granted Lesher's motion for nonsuit on Travelers' claim for reimbursement of attorney's fees and costs incurred in Lesher's defense. In addition, the jury expressly found that Travelers breached the implied covenant of good faith and fair dealing, wrongfully refused or failed to defend Lesher, and violated Insurance Code section 790.03, subdivisions (h)(2) and (h)(3).[1] It awarded compensatory damages of $1.5 million and an additional $1.5 million in punitive damages.

Travelers contends: (1) there is no substantial evidence that its conduct was the proximate cause of damage to Lesher; (2) the instructions given do not accurately state the law; (3) probative evidence was excluded and prejudicial evidence admitted; (4) there is no substantial evidence justifying the award of punitive damages; and (5) the nonsuit on its claim for fees was improper.

---

[1]The jury also found for Travelers and against Lesher on Lesher's cause of action for negligent misrepresentation.

Before we consider Travelers' contentions, we emphasize what is *not* at issue in this appeal. Lesher's theory of liability at trial was not dependent on a determination that Travelers had a duty to defend or indemnify under the terms of the policy. Instead, Lesher's theory was as follows. Despite the coverage dispute, once Travelers undertook Lesher's defense, it was obligated to conduct that defense with the same duty of care as if there were no coverage dispute. If Travelers breached that duty of care, it was liable for all damage to Lesher proximately caused by its acts or omissions, even though there was no actual coverage under the policy. Neither party has cited any case in which liability has been imposed on an insurer under similar facts. Nevertheless, Travelers does not contend that an insured has no cause of action under such circumstances.

Travelers argues that the jury was incorrectly instructed on the obligations of an insurer who defends under a reservation of rights, and that the trial court committed prejudicial evidentiary error. Accordingly, we will consider the jury instructions and the court's rulings on the evidence before we evaluate the sufficiency of the evidence on damages.

## A. *The Jury Instructions Given*

1. Among the several instructions on the obligations of an insurer was the following (Lesher's instruction 29): "Once an insurance company undertakes the defense of its insured, its duty to defend continues unless and until the absence of that duty has been finally adjudicated. A final adjudication is when there are no longer any rights to appeal. Until there is a final adjudication, the insurance company must defend its policyholder with the same degree of care as an insurer who does not contest the existence of its obligation to defend."

■ Travelers' argument with respect to this instruction, as we understand it, is that it could have withdrawn from Lesher's defense once the trial court issued its first summary adjudication order, and that the jury should have been so informed. However, we need not decide what circumstances, if any, would justify an insurer withdrawing from a defense which it has assumed before there has been a final judgment determining noncoverage. As Lesher correctly points out, Travelers never attempted to withdraw from the defense, and an instruction on the insurer's right to withdraw would have been inappropriate. Instructions on principles of law not applicable to the issues in a case tend to confuse and mislead the jury and should not be given. (*Harris* v. *Chisamore* (1970) 5 Cal.App.3d 494, 500 [85 Cal.Rptr. 223].)

■ In the alternative, assuming for the sake of argument that the instruction was erroneous insofar as it led the jury to believe that an insurer

which undertakes a defense under a reservation of rights must always continue to defend until there has been a final determination of noncoverage, we conclude that Travelers could not have been prejudiced by the error.

Error in instructing the jury requires reversal only when the reviewing court concludes that the error has resulted in a miscarriage of justice within the meaning of article VI, section 13 of the California Constitution. A miscarriage of justice has occurred only when this court concludes that it is reasonably probable a result more favorable to the appealing party would have been reached absent the error. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 770-771 [206 Cal.Rptr. 354, 686 P.2d 1158]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

The question before the jury was not whether Travelers properly or improperly withdrew from Lesher's defense, but whether the defense which it provided was conducted in good faith and with due care. Therefore, even if instruction 29 led the jury to believe that Travelers had no choice but to continue to defend Lesher, it is not reasonably probable that this belief affected the jury's assessment of the quality of the defense provided.

2. Travelers also objects to Lesher's instruction 32, which charged the jury as follows: "An insurance company may not withhold permission from the attorneys retained to represent an insured to evaluate or negotiate a settlement of a third party claim on behalf of the insured. To do so constitutes a breach of the implied covenant of good faith and fair dealing."

■ In general, an insurer's duty to defend includes a duty to negotiate and evaluate settlement offers. (*Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 873 [110 Cal.Rptr. 511]; *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 429 [58 Cal.Rptr. 13, 426 P.2d 173].) The caliber of defense owed by the insurer once the defense is assumed is not affected by the existence of a coverage dispute between insurer and insured. (14 Couch, Insurance (2d ed. 1982) § 51.78, pp. 565-567.) Even when there is a coverage dispute, the insurer deciding whether or not to settle must conduct itself as if it alone were liable for the entire amount of the judgment. A belief that the policy does not provide coverage should not affect the insurer's decision as to whether a settlement offer is a reasonable one. (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 15-16 [123 Cal.Rptr. 288, 538 P.2d 744].)

Perhaps in recognition of the foregoing rules, Travelers does not disagree with the principle set forth in instruction 32. Instead, Travelers argues that because the instruction provided no guidance as to whose funds are to be

committed during settlement negotiations, the jury could only have concluded that Travelers had a duty to settle the antitrust cases with its own funds. It had no such duty, Travelers reasons, because it had no duty to indemnify.

 Travelers' argument is based on a strained reading of the instruction. "A reviewing court must adopt the construction of jury instructions which will support rather than defeat the judgment if they are reasonably susceptible to such interpretation. [Citations.]" (*Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 465 [136 Cal.Rptr. 653].) Reasonably read, instruction 32 accurately states the law. It refers only to evaluating and negotiating a settlement and neither states nor implies that when there is a coverage dispute the insurer must commit its own funds in order to engage in negotiations. We need not decide, therefore, whether it would have been error to instruct the jury that Travelers was obligated to contribute to any settlement under the facts of this case.

3. Next, Travelers contends that the court erred when it instructed the jury with respect to the provisions of Insurance Code section 790.03, subdivisions (h)(2) and (h)(3).[2] First, Travelers contends that while subdivisions (h)(2) and (h)(3) might extend a duty to third party claimants, they are not applicable in an action brought by an insured arising out of a third party claim. In other words, Travelers contends that an insured cannot state a cause of action under those subdivisions. The contention is without merit.

"[A]n examination of the language of subdivision (h) demonstrates that it was intended to prohibit unfair settlement practices by the insurers directed against both claimants and insureds." (*Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880, 888 [153 Cal.Rptr. 842, 592 P.2d 329].) That an insured may state a cause of action under section 790.03, subdivisions (h)(2) or (h)(3), was made clear in *Frommoethelydo* v. *Fire Insurance Exchange* (1986) 42 Cal.3d 208 [228 Cal.Rptr. 160, 721 P.2d 41]. In that case during an investigation of an insured's claim for a burglary loss, the insurer suspected insurance fraud and reported the matter to the Bureau of

---

[2]Insurance Code section 790.03, subdivisions (h)(2) and (h)(3), provide as follows: "The following are hereby defined as unfair . . . practices in the business of insurance.

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(h) Knowingly committing or performing with such frequency as to indicate a general business practice any of the following unfair claims settlement practices:

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

"(3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies."

Fraudulent Claims as is required by Insurance Code section 12992. The insured was arrested but criminal charges were eventually dismissed. The insured then brought an action against his insurer, alleging violations of section 790.03, subdivisions (h)(3) and (h)(5), among other causes of action. He argued that a more thorough investigation would have established that he had not committed fraud. (*Frommoethelydo, supra,* at pp. 213-215.) The Supreme Court held that because the insurer's report was privileged, the insured could not recover for injuries attributable to the report. Nevertheless, the court stated that an insured may recover damages for failure to investigate in violation of the statutory duty to engage in fair practices where recovery is not predicated upon injuries due to a privileged report. (*Id.,* at pp. 219-220.)

■■■ Travelers next asserts that there was no evidence to support the giving of the instructions on the Insurance Code. Travelers does not discuss what evidence was introduced in support of the instructions, does not explain why this evidence was insufficient, and does not explain how the verdict was affected by this alleged error. Travelers simply makes an obscure reference to documents concerning the Worrell action, and argues that there was instructional error. Because this claim of error has been inadequately set forth, we will not consider it.

■■■ Finally, relying on *Dalton* v. *Metropolitan Property & Liability Ins. Co.* (1982) 136 Cal.App.3d 1037 [186 Cal.Rptr. 685], Travelers claims that liability for a violation of Insurance Code section 790.03, subdivisions (h)(2) and (h)(3), is predicated on the existence of coverage under the policy. While it is true that the court in *Dalton* "affirmed the award of summary judgment for the carrier upon a complaint framed in part under Section 790.03, because the policy provided no coverage," that case provides no support for Travelers' argument.

The *Dalton* court did not hold that section 790.03 only applies when there is coverage. It simply noted that Dalton had sued her insurer under section 790.03 for failing to honor her claim, and affirmed the trial court's decision that the claim was not covered under the policy. Travelers does not advance a persuasive basis for holding that an insurer need process in a prompt and competent manner only those claims for which there is coverage. Logic compels the conclusion that under section 790.03, the insurer must process all claims submitted to it promptly and competently, even in those instances where no coverage will ultimately be provided.

B. *Instructions Refused*

■■■ 1. Travelers contends that the court improperly refused to give the following instruction: "The insurer's obligation to defend is discharged

when it retains competent counsel." The court rejected this instruction as "just too restrictive." Travelers argues that refusal to give this instruction was prejudicial because without it, the jury was permitted to attribute any of counsel's acts or omissions to Travelers.

 Each party in a civil case must propose complete and comprehensive instructions consistent with his or her theory of the litigation. If the parties do not do so, the trial court has no duty to instruct on its own motion. Nor is a trial court obligated to seek out theories which a party might have advanced, or to articulate for him or her that which has been left unspoken. (*Finn* v. *G. D. Searle & Co.* (1984) 35 Cal.3d 691, 701-702 [200 Cal.Rptr. 870, 677 P.2d 1147].)

 The attorney hired by the insurer to represent the insured is an independent contractor, and it appears that the insurer is not vicariously liable for the negligence of trial counsel appointed to represent the insured (provided, of course, the attorney is not controlled by the insurer). (*Merritt* v. *Reserve Ins. Co., supra,* 34 Cal.App.3d at pp. 880, 881.) It does not necessarily follow, however, that the insurer's only duty to its insured is to hire competent defense counsel. The court in *Merritt* noted that the insurer must also provide the attorneys with sufficient funds to conduct the defense, and "keep abreast of the progress and status of the litigation in order that it may act intelligently and in good faith on settlement offers." (*Id.,* at p. 882.) Other duties and obligations may attach if "necessary to assure the provision to [insured] of a proper defense by the insurer." (*Spindle* v. *Chubb/Pacific Indemnity Group* (1979) 89 Cal.App.3d 706, 712, fn. 2 [152 Cal.Rptr. 776].)

 Given these additional components of the insurer's obligation to defend, the court correctly concluded that the proposed instruction did not fully and adequately define the insurer's duty to defend. The court was under no obligation to modify the instruction on Travelers' behalf. The instruction was properly refused.

2. Travelers also unsuccessfully sought to have the jury instructed with BAJI No. 3.50, which (1) defines contributory negligence as negligence on the part of the plaintiff and (2) states that the damage to which the plaintiff would otherwise be entitled because of defendant's negligence shall be reduced in proportion to the amount of negligence attributable to the plaintiff. Travelers contends the court erroneously refused to give that instruction.

 A party is entitled to instructions on his or her theory of the case, but those instructions must be properly stated. The trial court need not give instructions which are incomplete or misleading. (*Mapes* v. *Yowell* (1960)

54 Cal.2d 231, 233-234 [5 Cal.Rptr. 159, 352 P.2d 527, 87 A.L.R.2d 536]; *Levy-Zentner Co.* v. *Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 782 [142 Cal.Rptr. 1].)

It has recently been held that in an appropriate case, the affirmative defense of the insured's "comparative bad faith" may be available to an insurer. (*California Casualty Gen. Ins. Co.* v. *Superior Court* (1985) 173 Cal.App.3d 274, 280-284 [218 Cal.Rptr. 817].) Assuming arguendo the correctness of the *California Casualty* court's analysis, the instruction proposed by Travelers was an inadequate explanation of that affirmative defense. The proposed instruction spoke of negligence, not of comparative or contributory *bad faith*. The only other instruction referring to negligence was that on Lesher's cause of action for negligent misrepresentation. Nothing in the proposed instruction related the concept of contributory negligence to the bad faith causes of action. Because the instruction as proposed would only have confused the jury, it was properly refused.

## C. *Evidence Excluded*

As stated, Lesher was insured by U.S. Fire with an excess coverage policy. Travelers was of the opinion that this policy provided primary coverage, and that U.S. Fire had a duty to defend and indemnify Lesher. Travelers theorized that U.S. Fire knew that it owed such a duty to Lesher but failed to disclose its obligation to Lesher. According to Travelers, rather than undertake Lesher's defense, U.S. Fire participated in a "sweetheart" agreement with him to cause Travelers to appear to be acting in bad faith.

Lesher objected to Travelers' attempts to question U.S. Fire's agents on the nature of the U.S. Fire policy on the ground that the evidence was not relevant. He pointed out that U.S. Fire's interests in fact were aligned with Travelers because Lesher would owe U.S. Fire $700,000 if Travelers prevailed on the coverage question. The trial court excluded the evidence pursuant to Evidence Code section 352. Later in the trial, Travelers attempted to call an expert on insurance coverage to testify that U.S. Fire's representatives had incorrectly assumed that their policy was a "following form" policy rather than policy providing "independent coverage." The court did not permit this expert to testify, and Travelers asserts error as to these rulings.

The evidence was of minimal probative value at best. Even if Travelers' expert had testified that U.S. Fire's policy provided primary coverage, that evidence would not have established that U.S. Fire and Lesher schemed against Travelers. The evidence would have been confusing, time-

consuming, and inconclusive. The court's decision to exclude this evidence under Evidence Code section 352 was not an abuse of discretion.

### D. *Evidence Admitted*

1. Travelers broadly contends that the trial court abused its discretion under Evidence Code section 352 by denying its *in limine* motion to exclude *any* evidence on the summary adjudication orders.

First, we note that Travelers' characterization of the scope of its *in limine* motion is inaccurate. Before trial, Lesher advised the court of his intent to mention in his opening statement that the summary adjudication order was not final. Travelers objected, but not to the jury hearing about either the existence or the content of the summary adjudication orders. Rather, Travelers' objection was to informing the jury that the second order was still subject to review on appeal. Travelers feared the jury would then speculate about what the reviewing court might do. Later, during the course of the trial, several witnesses commented without further objection by Travelers about the appealability of the order.

Without discussion, Travelers asserts that the probative value of such evidence was "legally nonexistent." As for its prejudicial effect, Travelers argues that the admission of the evidence invited the jury to treat the "legal effect and integrity" of the trial court's order as issues of fact. Travelers also argues that admission of the evidence permitted the jury to hold Travelers liable for bad faith on the ground that it knew or should have known that the orders of summary adjudication were wrong, and should have ignored them.

In reviewing the exercise of discretion under Evidence Code section 352, the appellate court is not authorized to substitute its judgment for that of the trial court. (*Cain* v. *State Farm Mut. Auto. Ins. Co.* (1975) 47 Cal.App.3d 783, 798 [121 Cal.Rptr. 200].) Relief is available only where the alleged abuse constitutes a miscarriage of justice. When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which simply afford an opportunity for a difference of opinion. (*Brown* v. *Newby* (1940) 39 Cal.App.2d 615, 618 [103 P.2d 1018].)

First, we cannot agree that evidence of the appealability of the order had absolutely no probative value. The test of relevancy is not to be strictly applied to a single item of evidence. Each item need not stand alone as proof of an ultimate fact; instead evidence may have relevance only when considered with other evidence. (1 Witkin, Cal. Evidence (3d ed. 1986)

Circumstantial Evidence, § 309, pp. 278-280.) Furthermore, when an act is admitted into evidence, any other act necessary to make it understood may also be admitted. (Evid. Code, § 356.)

The fact that there was a coverage dispute was unquestionably relevant, and Travelers does not contend otherwise. To understand the chain of events and the parties' conduct, and the parties' contentions in this case, the jury had to be informed about that coverage dispute and Travelers' pursuit of declaratory relief. Travelers itself insisted that the substance of the trial court's summary adjudication order was relevant to prove Lesher's state of mind when he settled the Diablo Valley action. It would have been misleading to inform the jury of that order without also explaining that it was subject to appeal.

In addition, we are unpersuaded by Travelers' argument that it was prejudiced by this evidence. As Travelers seems to acknowledge, once it undertook Lesher's defense, the presence of the coverage dispute did not affect the degree of care with which it was obligated to handle that defense. Even if the jury did speculate that the summary adjudication order would be reversed on appeal, it is not reasonably probable that such speculation affected the decision that Travelers failed adequately to perform the defense it had undertaken.

2. Travelers also contends the court erred in permitting Lesher to testify that Travelers had cancelled his insurance policy. Travelers reasons that it did not "cancel" the policy; it simply exercised its statutory and contractual right not to renew it. In addition, Travelers also contends that the fact of nonrenewal was of no probative value.

■■■ Unless the policy provides otherwise, an insurer has no legal duty to renew an insurance policy when its term has expired. Ordinarily, therefore, an insured cannot base a cause of action for bad faith on nonrenewal, even if there is a coverage dispute between the insurer and insured over a prior claim. (*Greene* v. *Safeco Ins. Co.* (1983) 140 Cal.App.3d 535, 538 [189 Cal.Rptr. 616].) ■■■ We agree that the evidence of nonrenewal was irrelevant, but conclude that it is not reasonably probable that Travelers would have obtained a more favorable result absent its admission.

E. *Sufficiency of the Evidence of Proximately Caused Damage*

■■■ We turn now to Travelers' contention that there is no substantial evidence that its conduct was the proximate cause of damage to Lesher. Our analysis of this contention is strictly limited by long-settled principles of appellate review. ■■■ Ordinarily proximate cause is a question of fact

for the jury. (*Hoyem* v. *Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 520 [150 Cal.Rptr. 1, 585 P.2d 851].) Furthermore, when reviewing the sufficiency of the evidence, this court does not reweigh the evidence. We consider the evidence in the light most favorable to the prevailing party and in support of the judgment. (*Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121]; *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 398 [185 Cal.Rptr. 654, 650 P.2d 1171].)

In addition, a general verdict in favor of a party implies a finding in favor of that party on every material fact. (*Tillery* v. *Richland* (1984) 158 Cal.App.3d 957, 968 [205 Cal.Rptr. 191].) When a case has been tried on alternate theories of liability and the jury properly instructed, a general verdict implies that on all issues or theories submitted to it the jury has found in favor of the prevailing party. (*Codekas* v. *Dyna-Lift Co.* (1975) 48 Cal.App.3d 20, 25 [121 Cal.Rptr. 121].) When a case has been presented on alternate theories, it will be upheld against a challenge to the sufficiency of the evidence if the evidence supports the verdict on any one of the causes of action or theories of liability. (*Continental Dairy Equip.* v. *Lawrence* (1971) 17 Cal.App.3d 378, 383 [94 Cal.Rptr. 887].)

In its opening brief, Travelers does not attempt to analyze how the jury might have arrived at its $1.5 million compensatory damage award. Instead, Travelers' argument seems to assume that the award was based solely on the amount of the Worrell settlement ($1.2 million) and the Diablo Valley settlement ($300,000). With respect to the Worrell settlement, Travelers' argument in its opening brief also assumes that the award of damages was based on a theory that but for the breach, Lesher could have settled the case for less at some earlier date.

Travelers broadly asserts that none of its acts or omissions had any causal connection with any damage to Lesher. The initial focus of Travelers' argument seems to be that despite its wrongful conduct, Lesher was not forced to settle the case and could have gone to trial.

Travelers argues that although Farella did not participate in settlement negotiations on Lesher's behalf, Melchior competently initiated and conducted the negotiations in Farella's stead. Travelers reasons that as a consequence, no damages were caused by its failure to authorize Farella's participation in the negotiations.

As we will discuss, however, one of Lesher's damage theories was that he wanted to defend on the merits in the Worrell action, and believed he would have prevailed had he gone to trial. Instead, he claimed, he was forced to settle because of Travelers' failure to promptly provide counsel

and to prepare him adequately for trial. Any absence of a causal connection between Farella's failure to negotiate a settlement and the damage award is thus irrelevant to that theory of damages, which will be discussed in more detail, *post*.

Travelers also argues that there was no evidence to support Lesher's claim that the Braun affidavit, filed with the attorney billing sheets in the declaratory relief action, was of any benefit to the Worrells. However, several witnesses testified that the declaration provided useful information to the Worrells' law firm. Furthermore, the filing of that declaration must be considered not in isolation, but as one of a series of events which left Lesher unprepared for trial. The jury could reasonably have viewed the declaration as the catalyst which resulted in the Farella firm withdrawing from the case five and one-half months before trial. Despite the complexity of the case and the potential for a plaintiffs' verdict, Travelers then failed to appoint new counsel to defend Lesher until only five and one-half weeks before trial.

Next, Travelers points out that it offered Lesher the opportunity to select his own counsel after Farella withdrew, but Lesher refused to do so, even though Melchior was thoroughly familiar with the case. Because of Lesher's conduct, Travelers reasons, any causal effect of its own delay in appointing counsel vanished.

If Travelers' argument is that Lesher had a duty to compel Melchior to take up his defense under the circumstances here, that contention is unsupported by authority or by the record. In fact, the record indicates that Melchior was involved in another trial which was expected to continue through the beginning of January, and thus would not have been available to prepare to defend the Worrell action. The evidence was sufficient to support the jury's implied finding that Travelers' delays adversely affected Lesher's preparedness for trial.

Travelers then insists that none of its acts or omissions caused Lesher any damage because there is no evidence that those acts and omissions affected the amount of the settlement. There is absolutely no evidence, Travelers insists, that the Worrell case could ever have settled for any less than it did in December.

What Travelers' argument in its opening brief completely ignores, however, is that Lesher presented two alternative theories of damage in his argument to the jury. The first of those theories argued by Lesher's counsel to the jury, and characterized by him as "the fairest," was that Travelers' conduct forced Lesher to settle a case which he might have won. The jury's

general verdict necessarily implies that it found in favor of Lesher on this theory.

We have serious reservations about the quality of the evidence adduced at trial in support of this theory of damages. Our review of the lengthy record in this case indicates that evidence included Attorney Bryan's May 18, 1978, evaluation of the Worrell action. In that evaluation, he anticipated that the probable outcome of the action would be a verdict in plaintiffs' favor, but emphasized that the case was close and "far from indefensible." In addition, Melchior explained in some detail the Worrells' allegation against Lesher and Lesher's defenses to those charges, and testified that he thought there was an "excellent chance" that Lesher could prevail. Lesher himself testified that he thought "at all times we had a good defense" to the antitrust charges. At best all this evidence can be described as opinion testimony, at worst, as speculative.

In our view, Lesher's theory that he would have prevailed at trial in the underlying action if a proper defense had been provided was analogous to the theory of damage in an attorney malpractice case. The plaintiff in an action for attorney malpractice must first prove the attorney's negligence, and then, to establish damages, must also prove that but for that negligence a better result could have been obtained in the underlying action. (*Cook* v. *Superior Court* (1971) 19 Cal.App.3d 832, 834 [97 Cal.Rptr. 189].) "An attorney malpractice action then, involves a suit within a suit, a reconsideration of the previous legal claim, and only by determining whether or not the original claim was good can proximate damages be determined." (Note, *Client's Strategy for Damages Against the Malpracticing Attorney* (1964) 15 Hastings L.J. 590, 599.) This trial within a trial avoids the specter that the damages claimed by a plaintiff are a matter of pure speculation and conjecture. We are aware of no California cases which hold that in an attorney malpractice action, expert testimony alone would suffice to prove the outcome of the underlying case. Given the similarity between attorney malpractice cases and Lesher's unique theory of damages in this case, we conclude that he should have been required to try the underlying Worrell antitrust action within this bad faith action to sustain his claim that he would have successfully defended the Worrell action but for Travelers' acts and omissions.

However, a party may not object to the sufficiency of the evidence to support a finding against him or her when the absence of the evidence has resulted from its improper exclusion at his or her own instance. (*Kessler* v. *Gray* (1978) 77 Cal.App.3d 284, 290 [143 Cal.Rptr. 496].) A party who prevents proof of a fact by his or her erroneous objection will not be permitted to complain later of the lack of evidence, and a reviewing court will assume

that fact was fully proved. (*Watenpaugh* v. *State Teachers' Retirement* (1959) 51 Cal.2d 675, 680 [336 P.2d 165].) In light of the foregoing rules, our review of the record has convinced us that the speculative nature of the evidence that Lesher could have successfully defended the antitrust case is Travelers' fault.

During the trial, the following discussions took place out of the presence of the jury: Lesher's attorney had attempted to question Lesher about the Pittsburg Post Dispatch circulation, and Travelers objected. Lesher's attorney explained that the evidence that the Worrells had falsified circulation data was relevant because it was evidence that Lesher had "a good solid defense to that Worrell antitrust action." He then added: "Obviously we can't drag everybody into the antitrust action and try it all over again. Again, it goes to our frame of mind what we thought we had." Travelers' attorney then stated: "Secondly, I don't believe we are here to retry the antitrust lawsuit and all the hearsay statements and all the conclusionary statements they are going to make. We just can't defend that lawsuit the same time we are defending this lawsuit and I don't believe it is one of the issues in this lawsuit. And, for that reason, I object to them going into the nuts and bolts of the antitrust violations, on their part and/or on the part of the Worrell[s]." After a discussion about discovery, Travelers' attorney continued: "I think we get right down to the meat of the coconut, Judge, is the antitrust lawsuit. We are not here defending an antitrust lawsuit. And this jury, I'm sure—I don't presume to speak for the Court—but, I presume, this jury is not going to be instructed on the law of antitrust. [¶] And, (b), submitted to them special verdicts or whatever the case may be to determine whether or not there was a viable bona fide antitrust lawsuit underlying this action. [¶] If I am wrong in that regard, please tell me because then I am going to move for a continuance of the case so we can prepare an antitrust lawsuit." Lesher's attorney: "So will I, Your Honor." The court: "Well, bear in mind the fact that we don't want to try the antitrust case . . . ." Travelers' attorney then pointed out to the court that "pretty soon we will be coming to opinions and conclusions by this gentleman or others. Yes, we had a good defense to the antitrust suit, and that would be inadmissible what their opinions and conclusions are as to whether they had a good defense or not a good defense." Lesher's attorney: "That's the guts of our case is that we had a good defense, and they took it away from us." Travelers' attorney: "It is all speculation, Judge. Again we both—." Lesher's attorney: "Then we will try the antitrust case, because, Your Honor, that's the claim, that they deprived us from going to trial, and we had a good defense of the case." The court: "At least you felt you had one." Lesher's attorney: "Sure. It might have been a verdict for 20 million. I don't know." The court: "Let's go to lunch." It does not appear that the question of the need to try the antitrust claim was broached again at trial.

 From this discussion, it is apparent that Travelers strongly objected to trying the antitrust case within the bad faith case. While Travelers seemed to be seeking a ruling on the question from the court, its request was coupled with a request for a continuance. The trial court was not obligated to grant a continuance once trial had commenced, given Travelers' clear willingness to proceed without that evidence. Travelers makes no argument on appeal that the court committed error in this regard and cannot now contend that the evidence was too speculative.

Travelers also argues that the jury must have improperly included the $700,000 contributed to the Worrell settlement by U.S. Fire in its damage computations. Travelers urges that at the time of the trial, it could not be determined with any certainty whether or not Lesher would actually have to contribute the $700,000 from his own pocket. Lesher's agreement with U.S. Fire provides that he must reimburse that insurer the full $700,000 if he does not prevail on the coverage question on appeal. In light of our conclusion on that issue, Travelers' claim of error in this regard is moot.

The Worrell settlement was $1.2 million, but the jury awarded $1.5 million. Travelers seems to assume that the remainder of the award was based on the Diablo Valley settlement,[3] and argues that there is no substantial evidence that its conduct forced Lesher to settle for that amount.

As Lesher points out, however, up to $312,500 of the compensatory damages could have been based on an "excess premium" he paid the Worrells for the Pittsburg Post Dispatch. Lesher at one point testified that as of March 1978, he thought the Post Dispatch was worth between $250,000 and $300,000. Melchior testified that he thought the real value of that paper was not more than $350,000 to $400,000, and that the rest was an over-payment due to the need to settle the case.

Lesher also points out that the damage award may have included $185,805 of the $206,000 in fees which he paid Melchior. According to Melchior, had this been a normal "shadowing-type situation" his fees would have been 10 percent of that amount. In his argument to the jury, Lesher urged the inclusion of these fees in the award of damages.

In sum, the amount of the Worrell settlement ($1.2 million), the "excess premium" paid for the paper ($312,500), and the excess fees paid to Melchior ($185,805) add up to more than the $1.5 million in compensatory damages awarded by the jury. The compensatory damage award can be

---

[3]That action was settled for $300,000. As stated, Melchior testified that properly evaluated and defended, the Diablo Valley case would have settled for $20,000 to $50,000.

upheld on that basis, as we must view the evidence in the light most favorable to the verdict, and presume that the jury found all facts necessary to support the judgment. Thus we need not consider whether the evidence also supports a finding that Travelers' acts and omissions were the proximate cause of the Diablo Valley settlement.

## F. *Sufficiency of Evidence of Punitive Damages*

■ Travelers also contends the evidence is insufficient to support the award of punitive damages.

To justify an award of punitive damages, the defendant must be guilty of oppression, fraud, or malice. (Civ. Code, § 3294, subd. (a).) Lesher's theory in this case was that Travelers acted with malice. As used in section 3294, "malice" means conduct intended to injure or conduct carried on with a "conscious disregard" of another's rights. (§ 3294, subd. (c)(1); see *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980].) Evidence establishing "conscious disregard" is evidence indicating that the defendant was aware of the probable consequences of his or her acts and willfully and deliberately failed to avoid those consequences. (*Weisman* v. *Blue Shield of California* (1984) 163 Cal.App.3d 61, 66-67 [209 Cal.Rptr. 169].)

■ In a bad faith action, evidence that the insurer has violated its duty of good faith and fair dealing does not alone necessarily establish that it has acted with the requisite intent to justify an award of punitive damages. (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462-463 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at pp. 922-923.) Even if an insurer acted unreasonably, it need not follow that it also acted with malice. (*Beck* v. *State Farm Mut. Auto. Ins. Co.* (1976) 54 Cal.App.3d 347, 355-356 [126 Cal.Rptr. 602].) In this case, therefore, our assessment of the sufficiency of the evidence to support the punitive damages award involves an examination of the evidence of Travelers' motive and intent. (See *Neal* v. *Farmers Ins. Exchange, supra,* at p. 922.) There must be evidence that Travelers was aware of the probable adverse consequences to Lesher of its acts or omissions, and that it willfully and deliberately failed to take the steps necessary to avoid those consequences. (*Weisman* v. *Blue Shield of California, supra,* 163 Cal.App.3d at p. 67.)

■ We are mindful that in reviewing an award of punitive damages, this court applies the substantial evidence test, reviewing the record in a light most favorable to the judgment. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at pp. 922-923; *Egan* v. *Mutual of Omaha Ins. Co.* (1979)

24 Cal.3d 809, 821 [169 Cal.Rptr. 691, 620 P.2d 141].) Nevertheless, substantial evidence is not synonymous with "any" evidence. Substantial evidence is evidence which is reasonable in nature, credible, and of solid value; it must be of "ponderable legal significance." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) Where the evidence does not permit an inference of malice, the reviewing court must reverse an award of punitive damages. (See, e.g., *Beck* v. *State Farm Mut. Auto. Ins. Co., supra,* 54 Cal.App.3d at pp. 355-356.)

With those principles in mind, we have examined all the evidence which Lesher urges in support of the award. We have concluded that the award is not justified by the evidence and must be reversed.

Certain of that evidence merits little discussion. For example, Lesher points to Travelers' original appointment of the O'Connor firm, but nothing in the record directly or indirectly supports a finding that Travelers acted with malice in selecting that firm. Lesher also cites Travelers' cancellation or nonrenewal of his policy; as already discussed, however, that evidence was irrelevant and should not have been admitted.

As for the Braun affidavit, there was no substantial evidence that it was filed in conscious disregard of Lesher's rights. Braun testified that when he signed that affidavit, he viewed it as a routine matter; later, when the possibility that the affidavit might have been of use to the Worrells was suggested to him, he reviewed the situation and came to the conclusion that the bills could not have been used to Lesher's detriment. This testimony simply does not support a finding that the affidavit was filed with malice.

In his litany of Travelers' improper conduct, Lesher includes the evidence that at Travelers' home office, one person was responsible for handling both Lesher's coverage and his liability files. He notes that after the declaratory relief action was filed, one or more Travelers employees concluded that the policy did provide coverage but did not inform Lesher of this conclusion. Lesher points to evidence that one Travelers' employee characterized the insurer's duty to defend as "technical," and another expressed eagerness to terminate defense preparation in order to minimize Travelers' costs. Lesher mentions that Travelers' coverage claims people delayed in informing the home office that the summary judgment had been vacated; he also relies on evidence of a memorandum criticizing the handling of Lesher's defense, but cautioning that the memo should be read and destroyed.

Despite Lesher's assertions to the contrary, these acts and omissions, viewed singly or together, do not establish that Travelers had decided to extricate itself from Lesher's defense *regardless of the probable adverse*

*consequences to him.* The foregoing evidence establishes Travelers' obvious reluctance to defend in this case, but is not sufficient to establish that Travelers knew that its conduct would probably leave Lesher unprepared for trial, or that it willfully disregarded that adverse consequence as it proceeded with Lesher's defense.

 Lesher also finds evidence of Travelers' evil motive in the following evidence. Travelers did not inform him that the Farella firm had estimated his potential liability as in excess of the policy limits. It delayed in responding to his inquiries about contribution to settlement, and did not authorize the Farella firm or Renne to negotiate a settlement in either action. It delayed in appointing new counsel after Farella withdrew and then insisted that Renne reevaluate the Worrell case even though a settlement offer deadline was imminent. It did not contribute to the settlements in either case.

However, this evidence is also insufficient to support a finding that Travelers was guilty of malice. What Lesher overlooks but we cannot ignore is the uncontradicted evidence that Melchior, acting as Lesher's personal attorney and "shadowing" the defense, was actively involved in all phases of the two antitrust proceedings, including settlement negotiations with the Worrells. It is also undisputed that Travelers was fully aware of Melchior's participation. Given Melchior's involvement and Travelers' knowledge of his participation, the evidence does not permit an inference that Travelers acted in conscious disregard of Lesher's rights as it conducted his defense.

Because of Melchior's involvement, for example, Travelers had no reason to believe that its nonparticipation in settlement negotiations would prevent Lesher from settling. Under these circumstances, the evidence is insufficient to establish that Travelers acted with malice with respect to the settlement of either case. For similar reasons, the award of punitive damages cannot be justified because of the delay in appointing counsel once Farella withdrew. It was not unreasonable for Travelers to suggest that Lesher select his own counsel, given Melchior's role and Lesher's dissatisfaction with previous counsel. While Lesher was not obliged to do so, the fact that Travelers made that suggestion is not evidence of malice. Moreover, despite the additional delay, Travelers did eventually appoint counsel who apparently believed he could be ready for trial. Again, even if the delay was unreasonable, there is no evidence which would support an inference that Travelers knew the delay would probably leave Lesher unprepared for trial, and deliberately failed to avoid that consequence.

We conclude that the award of punitive damages must be reversed.

## G. *The Order of Nonsuit*

Finally, Travelers contends the trial court erroneously granted nonsuit on its claim for reimbursement of attorney's fees and costs incurred on Lesher's behalf in the antitrust actions. The trial court concluded that Travelers' claim was without support in law or on the record.

In considering a motion for nonsuit, the trial court must disregard conflicting evidence and give to plaintiffs' evidence all the value to which it is legally entitled, and indulge in every legitimate inference which may be drawn from the evidence. If the result is a determination that there is no evidence of sufficient substantiality to support a verdict in plaintiffs' favor, nonsuit is proper. (*Campbell* v. *Security Pac. Nat. Bank* (1976) 62 Cal.App.3d 379, 384 [133 Cal.Rptr. 77].) ▮ Before nonsuit can be disturbed, however, there must be some substance to plaintiffs' evidence upon which reasonable minds could differ. Proof raising mere suspicion, speculation, surmise, or conjecture is not enough. (*Id.*, at pp. 384-385.)

First, Travelers argues that the evidence it sent Lesher a "complete reservation of rights" was sufficient to require the question of its entitlement to attorney's fees and costs to go to the jury. We cannot agree.

In this case the letter accepting the defense under reservation of rights made no mention that Travelers intended to require Lesher to reimburse it for attorney's fees and costs should it prevail in the coverage dispute. The evidence was undisputed that it was not the practice of Travelers or other insurers to seek recovery of attorney's fees in cases defended under a reservation of rights. In fact, Travelers' claims representative Montes, who sent one of the reservation of rights letters to Lesher, testified that with that letter he did *not* intend to advise Lesher that Travelers in the future would seek reimbursement of fees. In short, given the state of the evidence, the trial court did not err in concluding as a matter of law that the reservation of rights letter was insufficient to entitle Travelers to reimbursement. (Cf. *Val's Painting & Drywall, Inc.* v. *Allstate Ins. Co.* (1975) 53 Cal.App.3d 576, 585-588 [126 Cal.Rptr. 267] [insurer notifies insured by letter that although it would defend, it did not "waive any of its rights or admit any obligations under the policy"; without more, letter insufficient to constitute an agreement with the insured that if coverage dispute was resolved against insured, insurer would look to the insured for reimbursement of reasonable amounts paid in settlement].)

Finally, in a cursory argument, Travelers suggests that its claim for reimbursement finds support in the equitable doctrine of quasi-contract or restitution. We disagree. Among settled principles of restitution is that

a person who, incidental to the performance of his own duty or to the protection of his own things, has conferred a benefit upon another, is not thereby entitled to contribution. (*Major-Blakeney Corp.* v. *Jenkins* (1953) 121 Cal.App.2d 325, 340 [263 P.2d 655].) The insurer who is uncertain whether coverage is provided under a policy undertakes the defense of its insured under a reservation of rights in large part to protect *itself* from a subsequent claim that it breached its agreement with the insured. (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 279 [54 Cal.Rptr. 104, 419 P.2d 168].) Although the assumption of the defense by the insurer without doubt also benefits the insured, it is not primarily undertaken for the insured's benefit. The trial court did not err in granting nonsuit.

The judgment is reversed insofar as it awards Lesher punitive damages. In all other respects, judgment is affirmed. Each party to bear its own costs.

White, P. J., and Benson, J.,* concurred.

A petition for a rehearing was denied December 24, 1986, and the petition of defendants, cross-complainants and appellants for review by the Supreme Court was denied February 11, 1987.

---

*Assigned by the Chairperson of the Judicial Council.