[No. B048249. Second Dist., Div. Three. Mar. 4, 1992.]

OWEN MOCK et al., Plaintiffs and Respondents, v.
MICHIGAN MILLERS MUTUAL INSURANCE COMPANY, Defendant
and Appellant.

## COUNSEL

Fisher & Hurst, Steven L. Sumnick, Peter O. Glaessner, Lori A. Sebransky, Garth A. Gersten, Kane & Whelan and Mark C. Kane for Defendant and Appellant.

Musick, Peeler & Garrett, James W. Miller and Brian E. Shear for Plaintiffs and Respondents.

## Opinion

**CROSKEY, J.**—The defendant and appellant, Michigan Millers Mutual Insurance Company (Michigan Millers), appeals from a judgment entered following a jury verdict in which the plaintiffs Owen R. Mock and Dora Mock (plaintiffs) were awarded compensatory and punitive damages. The action arose out of a claim made by plaintiffs under a policy of homeowner's insurance issued to them by Michigan Millers.

Plaintiffs asserted that Michigan Millers had unreasonably delayed its investigation, adjustment and payment of that claim and had improperly attempted to condition the ultimate payment which was made. Plaintiffs sought and obtained a recovery of compensatory and punitive damages based on a special jury verdict which found that Michigan Millers had breached the implied covenant of good faith and fair dealing and had violated Insurance Code section 790.03, subdivision (h). The jury also found that Michigan Millers had done so with malice.

While we agree that the evidence supports the jury's conclusion on liability for compensatory damages, we conclude that it clearly miscalculated those damages. In addition, the trial court prejudicially misinstructed the jury on the award of punitive damages. We therefore reverse and remand for a new trial on these issues.

### Factual and Procedural Background

A review of the record reflects that there is no significant dispute between the parties as to the facts, that is, what actually transpired. There is, of course, a substantial difference between them as to the reasonable inferences which should be drawn. We will therefore set forth a detailed chronological review of these facts as disclosed by the uncontradicted evidence. Such a recitation is important to our resolution of the principal issue in this case, which turns upon the adequacy of the instructions to the jury on the issue of punitive damages and our necessary evaluation as to whether, in light of the evidence, such misinstruction was prejudicial to Michigan Millers.

In 1966, plaintiffs purchased a home on the cliffs of Palos Verdes overlooking the Pacific Ocean in an area known as Bluff Cove. At the time of such purchase, the home was approximately five years old. For a number of

years prior to the filing of this action, plaintiffs carried their homeowner's insurance with Michigan Millers.

At the time that plaintiffs sustained the loss which is the subject of this action, their home had a fair market value which they allege to be approximately $1.5 million. However, the casualty coverage in Michigan Millers' policy in effect at the time of plaintiffs' claim provided only for $139,500 for damage to the dwelling, plus an additional 10 percent ($13,900) for damage to appurtenant structures (e.g., swimming pool, decking, etc.). Thus, plaintiffs were clearly underinsured.

In the summer of 1986, plaintiffs became aware that a number of their neighbors had sued the City of Palos Verdes Estates (the City) for earth movement and subsidence damage which had occurred to their property, allegedly due to the City's negligence in the construction and maintenance of a nearby storm drain. Apparently, due to the excess accumulation of water, an ancient landslide had been activated and there was significant earth movement along the entire cliff on which plaintiffs' home was located. However, plaintiffs' home, which was constructed closer to the road and further back from the cliff than many of the other houses, had suffered no apparent actual damage.

In the spring and summer of 1987, plaintiffs did notice some minor damage to their property which consisted of: (1) some movement of the decking around the swimming pool, (2) some cracks in the pool itself, (3) subsidence of some of the cement work surrounding the house (4) and cracking in the driveway. However, there was no obvious earth movement or sliding. Nonetheless, by the summer of 1987 it was clear that a number of nearby homes had sustained or were threatened with serious damage. The City had apparently settled with a number of plaintiffs' neighbors by purchasing their homes.

Plaintiffs brought the matter to the attention of their attorneys, Musick, Peeler & Garrett (MP&G) who, on May 12, 1987, wrote to Michigan Millers[1] and summarized the foregoing circumstances. However, as plaintiffs' home had sustained no observable physical damage to which specific repairs might be directed, the damages which plaintiffs had sustained were

---

[1]Actually, the letter was directed to White and Company, an agent for Michigan Millers, with whom plaintiffs had done business for years. The letter was forwarded to Michigan Millers and a reply was sent to MP&G on May 20, 1987, requesting additional information.

described as "a decrease in the market value of their property in excess of $600,000."[2]

Michigan Millers assigned an adjuster (Paul T. Zemel of Associated Insurance Adjusters Inc., hereinafter Zemel) to conduct an investigation. Zemel communicated by telephone with MP&G on June 4 and by letter on June 5, 1987.[3] He requested permission to take a statement from the plaintiffs and to inspect the property. Unfortunately, the plaintiffs were on an extended vacation and Zemel was not able to conduct the interview or inspect the property until July 30, 1987.

On that date, Zemel, accompanied by a professional geologist, went to plaintiffs' residence to meet with them and to inspect the property (see fn. 4, *post*). The plaintiff Owen Mock gave Zemel a recorded oral but unsworn statement. MP&G attorney James W. Miller was present and, indeed, supplied the answers to a number of the important questions submitted to his client. Mr. Mock described the relatively minor damage to his property which he had recently noticed and summarized what he had read in the newspapers about his neighbors' litigation with the City. He stated that he had not yet sought any professional opinions "from an engineering standpoint, either soil, structural or contractors." He also conceded that he had not yet made any claim against the City.

Mr. Mock was specifically asked, "What is it basically that you're claiming then, right now? I mean, is there a specific thing that you're claiming?" His attorney, Mr. Miller, answered for him and stated, "Well, yes, the repair, any property damage that may be caused by the, what we believe would be acts of the City and the depreciation in the fair market value of the home as a result of the acts of the City." However, neither Mr. Mock nor Mr. Miller provided Zemel with any information or demand as to specific damage to

---

[2]This letter, which was Michigan Millers' first notice of any claim by plaintiffs, did not describe, or seek payment for, any specific "property damage" which had been sustained to plaintiffs' property. The demand appeared to raise an immediate issue of coverage. Michigan Millers noted in its reply letter of May 20, 1987, that the claim did not appear to be based on or related to any "occurrence." Certainly, a legitimate question existed as to whether simple diminution in value or "loss of market value" constitutes "property damage" within the meaning of the standard homeowner's casualty policy. (See, for a discussion of this issue in a different context, *New Hampshire Ins. Co.* v. *Vieira* (9th Cir. 1991) 930 F.2d 696, 697-701.) A Michigan Millers internal memo, dated May 29, 1987, noted that "this is the first type of claim that has been presented to our Company alleging loss of market value as a property damage claim" and directed assignment of an adjuster and commencement of an immediate investigation.

[3]By separate correspondence, on June 8, 1987, Michigan Millers wrote to MP&G and noted that it had received no response to its letter of May 20, 1987, but was assigning Associated Insurance Adjusters, Inc., to the case. MP&G was requested to deal with that firm in connection with plaintiffs' claim.

property or any estimates to either repair or prevent damage to plaintiffs' home or property.

Zemel caused a transcript of this interview to be prepared and sent, in early September, to MP&G for review and signature by Mr. Mock. It was signed on September 23, 1987, and returned to Zemel by MP&G letter of September 25, 1987, in which counsel stated that, "As you now have American Geotechnical's Geology Report, and the insureds [*sic*] statement, it is hoped that a prompt response to Mr. and Mrs. Mock's claim is forthcoming."[4]

Zemel had forwarded the geology report to Michigan Millers on September 17 and had noted it was rather inconclusive with respect to whether the nearby landslide activity had actually yet damaged plaintiffs' property. It did not appear that there were any pressing circumstances which required an expedited handling of plaintiffs' claims. No specific damage was identified which needed to be repaired, nor did it appear that any conclusions had been reached, either by plaintiffs, their attorneys or Michigan Millers as to how to proceed.[5] Nevertheless, on September 29, 1987, Zemel wrote to Michigan Millers and summarized his view of the situation: "Our options seem to be

---

[4]Prior to the inspection and interview on July 30, 1987, Zemel had retained a professional engineering firm (American Geotechnical) to accompany him to plaintiffs' residence on that date in order to inspect and evaluate the property. A report was submitted to Zemel on or about September 1, 1987, in which American Geotechnical summarized its conclusions as follows:

"Dear Mr. Zemel: [¶] At your request this consultant has conducted limited review and research pertaining to the Mock residence. *We find that the home is suffering from minor damage in the form of various hairline crack separations and differential movement. It is this consultant's opinion that the stress features have occurred as a result of the expansive nature of the soil at the site and is not due to the landslide environment in which the home is situated.* The home is located at the top of a high bluff in the northwest area of the Palos Verdes Peninsula. Other homes in very close proximity have suffered severe distress and some have been demolished as a result of the landslide activity. Although this slide activity has undoubtedly lowered the level of stability of the Mock residence, it does not appear to have contributed in any measurable way to cracks or separations." (Italics added.)

American Geotechnical also noted that a more thorough study (involving, e.g., test pits, drilling and test of core samples) of the plaintiffs' property could run as high as $60,000.

[5]In his fifth status report to Michigan Millers, dated September 17, 1987, Zemel summarized the status of the matter:

"For some reason, the Mock's home being situated further away from the bluffs, did not sustain any noticeable damage and for other reasons, Mr. Mock seemed to be somewhat oblivious to what was going on around him, even though he was aware of the law suits especially in the last one year period of time. [¶] At this time the Mocks appear to be in the process of making a claim, however their present attorney, Mr. Miller, is not exactly sure as to whether he wants to put in a claim with Michigan Millers, especially understanding that the insurance company will have first right of subrogation. Keeping in mind that the City seems to be paying everybody else in the area, there is a very good chance the City will most likely also be paying the Mocks eventually. [¶] The situation is further complicated now by the fact

relatively simple; we either go on with very extensive testing which can run anywhere from $30,000 to $60,000, or we can work out some adjustment with the insured's attorney, which appears to be at best only a loan type of situation."

On October 16, 1987, MP&G wrote to Zemel and advised that plaintiffs intended to file suit against the City on October 30, 1987, and expected to receive from Michigan Millers a response as to plaintiffs' claim by that date. This letter, as did the one on September 25, implied that Mr. Mock's oral statement (given on July 30 and signed on September 23), together with the American Geotechnical Geology report, provided Michigan Millers with sufficient information to make a decision with respect to the claim. Plaintiffs in fact filed their suit against the City on November 4, 1987, based, at least partially, on the American Geotechnical Geology report of September 1, 1987.[6] On November 10, 1987, MP&G again wrote to Zemel to inquire into the status of the plaintiffs' claim. Included in the letter was a thinly veiled threat of an action for bad faith.

that at least in the preliminary report from American Geotechnical, they cannot find any particular damage to the house of which they can state is definitely related to the inverse condemnation situation as opposed to what would amount to normal settling and a very expansive soils situation on which the home is setting. [¶] It must, however, be kept in mind that with the preliminary study and most likely with even very extensive studies, one could never really rule out the possibility of contributory causes of damage being attributed to the landslide situation which is in essence, constantly moving even though somewhat stabilized at this time."
This characterization of the circumstances as they existed on September 17, 1987, is part of the trial record and was not contradicted by any evidence offered at trial.
[6] The portion of the report relied on was referred to in a letter sent to Zemel by MP&G on November 10 and states in part:
"The various stress features observed at the Mock residence are believed to be substantially the result of expansive soil action on a structure not designed with immunity towards expansive soil influence. . . . To date there is no apparent influence by the landslide activity and general bluff instability acknowledged to exist in proximity to the Mock residence. . . . [¶] The stress features which have been observed at the site appear to be the result of ongoing geotechnical influences over many years. In effect, it is believed that the influences producing the stress features have been active since the time of original construction. . . . [¶] *In the absence of mitigating measures, the conditions at the Mock residence can be expected to gradually deteriorate.* This gradual deterioration would be in response to the same adverse local geotechnical phenomena (e.g., expansive soil) that have been described above. *The possibility of more rapid deterioration resulting from involvement in overall bluff stability cannot be ruled out. The rear yard area would probably be first to be influenced. Bluff problems generally occur in a retrogressive fashion and the house is substantially behind the top of the slope. Ultimately the house could be involved.* . . . [¶] Although specific recommendations for treating existing stress features are beyond the scope of this study, it would appear feasible to develop remedial improvement options for the current conditions. With respect to more deep seated instability, however, there does not appear to be any feasible way to mitigate the landslide possibility." (Italics added.)

On November 18, 1987, officials of Michigan Millers met with Zemel and, contrary to the written legal advice received from counsel, made the decision that no dispute would be raised as to coverage.[7] However, in view of the inconclusive nature of the existing geology report, it was not yet possible to determine whether it was feasible to stabilize plaintiff's land and, if so, the cost thereof. Therefore, it was determined that a supplemental report would be requested from American Geotechnical which could be used to justify a policy limits settlement with plaintiffs, as it was very likely that the relatively low amount of plaintiffs' coverage would be exceeded by any reasonable estimate of the cost of land stabilization or other damage prevention efforts. The record reflects that at this time Michigan Millers was also very concerned about protecting its subrogation position.[8] It was concerned that payment of policy limits, without a documented basis for such a payment, could result in the possibility that Michigan Millers would be held to have acted as a volunteer, thus damaging its subrogation claim.

On November 25, 1987, MP&G wrote directly to Michigan Millers and demanded that a decision to pay policy limits and all attorney fees be made by December 9, 1987. The letter also indicated that it was plaintiffs' understanding that Zemel had recommended to Michigan Millers a settlement for the policy limits. While Michigan Millers denied that any such recommendation had been made in November, a fair reading of Zemel's report of December 30, 1987, makes it clear that by that date, given plaintiffs' relatively low policy limits, an offer to pay those limits was certainly appropriate, if not specifically recommended.[9]

---

[7]Apparently, an arguable basis for denying coverage existed. Michigan Millers' policies written after 1983 contained concurrent causation exclusionary language relating to earth movement and subsidence caused or contributed to by third party negligence. Based on this policy language, Michigan Millers' attorneys had advised them, in an opinion letter dated November 17, 1987, that coverage should be denied. However, Michigan Millers was aware of facts which would support the conclusion that the City's negligence had occurred prior to 1984 and that while the plaintiffs did not then see appreciable damage it was possible that significant damage had occurred under earlier policies which contained no such exclusions. (We note, however, that the *maximum coverage* of the earlier policies was $119,000 for the dwelling plus 10 percent ($11,900) for appurtenant structures.)

[8]Indeed, Michigan Millers had instructed its local claims officer to notify the City of its subrogation claim as early as August 5, 1987.

[9]In his report to Michigan Millers of December 30, 1987, Zemel stated:

"*Again, it appears that there are only two choices.* If you wish to find out academically exactly how much loss has taken place, you're talking approximately $30,000 to $60,000 worth of exploratory work which would basically not accomplish anything as far as settling this claim. [¶] The expert then further states that in the consultant's opinion, it is like [*sic*] that this form of investigation will confirm the adverse landslide influence to the subject property. [¶] *Obviously, this report in itself is not the only answer. What we will need to do now is to either have a structural engineer prepare a set of plans and then have a contractor bid the plans, however there is again, no doubt in this adjuster's mind that this will well exceed the*

On December 24, 1987, plaintiffs filed this action on four theories: (1) breach of contract, (2) breach of the duty of good faith and fair dealing, (3) breach of fiduciary duty and (4) violation of the insurer's statutory duties under Insurance Code section 790.03, subdivision (h).[10] They alleged that although the claim had been filed in May of 1987 and Michigan Millers had inspected the property and interviewed plaintiffs, they had taken no action on the claim and, indeed, apart from a notice of policy nonrenewal[11] had not corresponded with plaintiffs or responded to any of plaintiffs' demands.

*policy limits. Our problem might be simply resolved by simply offering the insured the policy limits, making a quick payment to them of the policy limits, and then continuing with the structural report and contractor's report for subrogation purposes, but not necessarily to wait on a structural report, which could take at least several months to prepare, and a contractor's report, which would take at least a month after that.* [¶] At this time, then, I request that you give me a call to conference on this situation. I further believe that if you have not already answered the attorney's previous letter, that this be addressed as soon as possible. Otherwise, there is no doubt in my mind that we will most likely end up with a full investigation, litigation, which will far exceed our policy limits situation." (Italics added.)

[10]However, the case only went to the jury on the tort claims of (1) breach of the implied covenant and (2) violations of the Insurance Code. As this case was filed and pending prior to the Supreme Court's decision in *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58], plaintiffs were also entitled to pursue the statutory bad faith claim. (*Id.* at p. 305; *Zephyr Park v. Superior Court* (1989) 213 Cal.App.3d 833, 840 [262 Cal.Rptr. 106].) Plaintiffs alleged and ultimately offered expert opinion testimony that Michigan Millers violated six provisions of Insurance Code section 790.03, subdivision (h). That section prohibits an insurer from knowingly "committing or performing with such frequency as to indicate a general business practice any of the following unfair claims settlement practices [the following are the six provisions which plaintiffs' expert testified were violated by Michigan Millers]:

"(1) Misrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue.

"(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(4) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured.

"(5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

"(6) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered.

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(11) Delaying the investigation or payment of claims by requiring an insured, . . . to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information.

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . "

[11]On December 14, 1987, Michigan Millers advised plaintiffs in writing that when the current policy expired on February 3, 1988, it would not be renewed.

Plaintiffs sought the benefits due under the policy, plus $1 million for emotional distress[12] and $2 million in punitive damages.

Sometime between December 30, 1987, and February 1, 1988, Michigan Millers made the decision to pay the policy limits. However, Zemel had previously advised Michigan Millers that a formal estimate first be obtained to justify such a payment. In spite of this recommendation, Michigan Millers, without conducting any further investigation or seeking any formal cost estimates, wrote directly to MP&G on March 1, 1988, and informed them that the investigation was complete and enclosed a claim form for completion and execution by plaintiffs. MP&G forwarded this correspondence to Michigan Millers' counsel, stating that as far as they were concerned no further claim documentation was required but that, if a formal claim was now required, plaintiffs had no objection to providing it. A fully executed and notarized claim form was ultimately prepared and signed in which plaintiffs formally demanded the policy limits of $139,500 ("or dwelling/appurt. structure policy limit of the most recent applicable policy"). This executed form was finally sent to Michigan Millers on April 22, 1988.

On June 22, 1988, counsel for Michigan Millers wrote to MP&G, enclosing a draft for the sum of $153,450 but stating that its negotiation was conditioned on the execution and delivery by plaintiffs of an assignment of their rights against the City to the extent of such payment. The draft was dated June 9, 1988, and was made payable to plaintiffs (and their mortgagee). Also enclosed was a subrogation receipt containing the required assignment language. However, plaintiffs refused to assign any subrogation rights to Michigan Millers.

Although the execution and return of the assignment document had been made a condition of plaintiffs' negotiation of the draft, MP&G wrote Michigan Millers on July 25, 1988, to advise that the draft would nonetheless be negotiated *without execution of the assignment receipt*. Further, plaintiffs would not execute the additional proof of loss document which had also been requested by counsel's letter of June 22, 1988.

This action was consistent with plaintiffs' position that Michigan Millers did not have any legal claim to first dollar subrogation rights in plaintiffs' action for damages against the City. This view found support in plaintiffs' action against the City where Michigan Millers' subsequent motion to intervene was denied at plaintiffs' request.

---

[12]At trial, plaintiffs offered no evidence of emotional distress damages nor did they request such relief from the jury. Plaintiffs' compensatory damages were limited to interest on the delayed payment of the policy benefits and the attorney fees which they had incurred in order to obtain such payment.

In this matter, the court bifurcated the case for trial and tried liability issues first. At the conclusion of the first phase, the jury, on December 11, 1989, returned a special verdict finding that Michigan Millers (1) had breached the covenant of good faith and fair dealing, (2) had breached certain provisions of Insurance Code section 790.03, subdivision (h) and (3) did *not* act with oppression but *did* act with malice.[13]

The second or damage phase of the trial began the next day. Evidence was offered of plaintiffs' attorney fees incurred from September 30, 1987.[14] In addition, evidence of Michigan Millers' financial condition and earnings was received. Plaintiffs asked the jury to award them their attorney fees ($18,384.12) plus 10 percent interest for the loss of use of the policy benefits from 60 days after July 30, 1987 (i.e., Sept. 30, 1987) until August 10, 1988 (when Michigan Millers draft for $153,450 was actually paid by the bank). They also asked the jury to award substantial punitive damages.

After relatively short deliberations, the jury returned a verdict in favor of plaintiffs for $31,585.02 in compensatory damages and $460,350[15] in punitive damages.

Michigan Millers' motion for a new trial was denied. It then filed this timely appeal.

### CONTENTIONS OF THE PARTIES

Michigan Millers claims that the trial court misconstrued the policy and permitted a recovery of compensatory damages when, under the clear provisions of the policy and the undisputed evidence, it had (1) made a timely payment of policy proceeds and (2) *was* entitled to demand a subrogation assignment from the plaintiffs. Thus, it did not, as a matter of law, breach either the covenant of good faith and fair dealing or any of its statutory duties. Therefore, there is no basis for the award of compensatory or punitive damages.

---

[13]There was no finding as to whether Michigan Millers had breached its insurance contract with plaintiffs. We therefore assume that such a finding was not sought by plaintiffs, that they abandoned their breach of contract theory and proceeded to judgment exclusively on their tort claims.

[14]That evidence (on direct examination) consisted of the testimony of one of plaintiffs' counsel as follows:

"Q. Mr. Shear, what was the amount of attorney's fees and costs paid by Mr. and Mrs. Mock *from September 30, 1987 forward* with respect to obtaining and protecting their insurance benefits for [*sic*] Michigan Millers Insurance Company? [Michigan Millers' objection to this question as irrelevant was overruled.]

"A. The amount incurred and paid was $18,384.12." (Italics added.)

[15]We note that this amount is exactly three times the amount of the draft sent by Michigan Millers to MP&G on June 22, 1988.

Michigan Millers also argues that the judge made four critical errors in the instructions to the jury on punitive damages: (1) the term "malice" was improperly defined, (2) the instruction on "despicable conduct" misstated the law, (3) an instruction on "non-intentional conduct" as a basis for punitive damages was improper and (4) the definition of "clear and convincing evidence" misstated the law. It contends that the separate and combined force of these improper instructions was prejudicial and violated its constitutional rights to due process. Finally, Michigan Millers contends that there was no substantial evidence of malice. For all of these reasons, it claims that the award of punitive damages must be reversed.

Plaintiffs dispute each of these contentions, argue that the evidence of Michigan Millers' tortious and malicious behavior was overwhelming and contend that the judgment should be affirmed.

## DISCUSSION

### 1. *Standard of Review*

As we have already noted, there is no substantial dispute between the parties as to the operative facts. There is considerable disagreement as to what reasonable inferences should be drawn therefrom. ■ Since the jury decided in favor of the plaintiffs we are compelled, in our review of the evidence, to presume that the judgment is correct and that all reasonable inferences were drawn in plaintiffs' favor. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289.)

■ However, with respect to our review of the issues relating to improper jury instructions and the question of their prejudicial impact (see *Weiner* v. *Fleischman* (1991) 54 Cal.3d 476, 490 [286 Cal.Rptr. 40, 816 P.2d 892]), we are not required to make such inferences in plaintiffs' favor. To the contrary, we must assume that the jury, had it been given proper instructions, might have drawn different inferences more favorable to Michigan Millers and rendered a verdict in its favor on the issues as to which it was misinstructed. (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 674 [117 Cal.Rptr. 1, 527 P.2d 353].)

With these standards in mind, we consider the issues raised by Michigan Millers.

### 2. *Delay in the Payment of Policy Benefits Until June of 1988 Was Not Justified Under the Policy*

■ Michigan Millers asserts here that its tender of the policy benefits to the full limit of the policy was made in a timely manner. It argues that the

policy provides that a timely payment could be made within *60 days* of an agreement with the insured as to the amount due *and* receipt of a properly signed proof of loss.[16] Michigan Millers claims that since it did not receive back the plaintiffs' fully executed proof of loss until approximately April 22, 1988, its tender of its draft for $153,450 on June 22, 1988, was authorized under the terms of the policy.

We reject this argument for two reasons: (1) it is an unjustified triumph of form over substance and (2) it ignores the fundamental basis of plaintiffs' action.

First, plaintiffs had effectively been demanding a policy limits settlement from the very outset. MP&G's initial letter of May 12, 1987, demanded $600,000, over three times the policy limit. It is a reasonable inference from the evidence that Michigan Millers had essentially come to the conclusion that the policy limits should be paid by no later than December 30, 1987. If a formal proof of loss statement was really required, Michigan Millers should have requested it earlier. Plaintiffs are clearly justified in their contention that their recorded statement of July 30, 1987, which was transcribed and signed by September 23, was sufficient, together with the geology reports of September 1 and December 23, 1987, to provide Michigan Millers with all the information it needed to determine the validity of the claim. Indeed, the record shows that, in the end, Michigan Millers was content to make its decision to pay based on this information. Moreover, the insistence on such a formality is prohibited by the Unfair Practices Act.[17]

The second reason for rejecting this argument is even more compelling. Michigan Millers' contention that its contractual duty to pay policy proceeds did not arise until plaintiffs first delivered the formal proof of loss may be a correct statement of general contract law principles, but it is not relevant. Plaintiffs did not ultimately seek to recover in contract but rather in tort. They asserted and relied upon both common law and statutory grounds. Thus, we must examine the behavior of Michigan Millers to determine if in

---

[16]The policy, in *"Section 1-Conditions,"* provides:

*"Loss Payment.* We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. *Loss will be payable 60 days after we receive your proof of loss* and:

"a. *reach an agreement with you;*

"b. there is an entry of a final judgment; or

"c. there is a filing of an appraisal award with us." (Italics added.)

[17]Insurance Code section 790.03, subdivision (h) (11), provides it is an unfair claims settlement practice for an insurer to delay "the investigation or payment of claims by requiring an insured . . . to submit a preliminary claim report [in this case the July 30, 1987 recorded statement], and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information."

its delay in the payment of policy benefits it acted unreasonably or without probable cause. (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574-575 [108 Cal.Rptr. 480, 510 P.2d 1032]; *McCormick* v. *Sentinel Life Ins. Co.* (1984) 153 Cal.App.3d 1030, 1046 [200 Cal.Rptr. 732].)

■ The judgment obtained against Michigan Millers was, in substantial part, based upon the finding that it had breached its duty under the implied covenant of good faith. While that duty arises from the contractual relationship between the parties, it is not strictly a contractual obligation. Rather, it is one "imposed by law which governs a party to a contract in discharging its contractual responsibilities." (*Murphy* v. *Allstate Ins. Co.* (1978) 83 Cal.App.3d 38, 48 [147 Cal.Rptr. 565].)

Thus, "an insurer has a law-imposed duty to act fairly and in good faith in discharging its contractual responsibilities to its insured." (*Delos* v. *Farmers Insurance Group* (1979) 93 Cal.App.3d 642, 650 [155 Cal.Rptr. 843].) What the insurer impliedly covenants is that it will do nothing to interfere with the right of the insured to receive the benefits due under the policy. (*Id.* at p. 650.) What this means is that an insurer has "a duty not to withhold unreasonably payments due under a policy" and when it does so it is subject to liability in tort. (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at pp. 573, 575.) ■ This duty is *unconditional* and *independent* of the performance of the insured's contractual obligations. (*Id.* at p. 578.) As the Supreme Court put it. ". . . the duty of good faith and fair dealing on the part of defendant insurance companies is an absolute one. At the same time, we do not say that the parties cannot define, by the terms of the contract, their respective obligations and duties. We say merely that no matter how those duties are stated, *the nonperformance by one party of its contractual duties cannot excuse a breach of the duty of good faith and fair dealing by the other party while the contract between them is in effect and not rescinded.*" (*Gruenberg, supra,* 9 Cal.3d at p. 578, italics added.) ■ The only conditions here relevant were that an agreement be reached as to the amount of the claim and that a formal loss document be submitted. The jury was entitled to conclude on this record that Michigan Millers had unreasonably delayed until April 22, 1988, in (1) reaching that agreement and (2) soliciting the formal proof of loss.

As the evidence was sufficient to support the jury's conclusion that Michigan Millers unreasonably delayed the payment of the benefits due under the policy after receiving adequate information to adjust the claim and "reach an agreement" with the plaintiffs, its determination that there was a breach of the implied covenant of good faith was amply supported.

### 3. *Michigan Millers Had No Right to Condition Payment of Policy Benefits Upon the Insured's Recognition of Claimed Subrogation Rights*

For the same reason, Michigan Millers' argument that it had a contractual right to condition the payment of policy benefits must also fail. The negotiation of the policy limits draft sent on April 22, 1988, was expressly conditioned by Michigan Millers upon the plaintiffs' execution of a "Subrogation Receipt." This condition was purportedly based upon the terms of the policy.[18] What Michigan Millers apparently sought was to obtain "first dollar" subrogation rights to plaintiffs' claim against the City which was then in litigation.

Quite apart from whether Michigan Millers had a clear right under the terms of the policy to insist upon a subrogation right (see, generally, *Travelers Indem. Co.* v. *Ingebretsen* (1974) 38 Cal.App.3d 858, 864-868 [113 Cal.Rptr. 679]), its attempt to condition its payment of policy proceeds upon plaintiffs' written recognition of such right was tortious misconduct. It cannot excuse its unreasonable delay in the payment of policy benefits by citing plaintiffs' alleged nonperformance of some contractual obligation under the policy. (*Gruenberg, supra,* 9 Cal.3d at p. 578.)

### 4. *The Trial Court Miscalculated the Compensatory Damages*

The jury's compensatory damage award was based upon its conclusion that the 60-day period in which Michigan Millers was compelled to pay the claim commenced running on July 30, 1987.[19] In the context of the policy before us, the jury necessarily concluded that Michigan Millers should reasonably have reached an agreement with plaintiffs by July 30, 1987, that (1) there was coverage under the *current* policy and (2) payment of the policy limit was both justified and appropriate.

However, July 30 was the date when (1) plaintiffs first made themselves available for a recorded statement and (2) Michigan Millers was first able to inspect the property in order to determine just what damage had been sustained by plaintiffs. As a result of that inspection a preliminary geology

---

[18]Paragraph 8 of "*Sections I and II—Conditions*" of plaintiffs' policy provided:

"*Subrogation.* An insured may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us. [¶] If an assignment is sought, an insured must sign and deliver all related papers and cooperate with us."

[19]This is the obvious conclusion from the fact that the interest and fee awards were calculated from September 30, 1987, a date 60 days after July 30, 1987. A review of the argument of plaintiffs' counsel to the jury reflects that he contended that the 60-day payment period under the policy started on July 30.

report was prepared. That report was not completed and submitted to Michigan Millers until approximately September 1, 1987. The transcript of plaintiff Owen Mock's statement was not reviewed, approved and signed by him and returned to Michigan Millers' adjuster until September 23, 1987.

Concurrently, Michigan Millers was considering the issue of coverage. The "damages" claimed by plaintiffs' original letter claim on May 12, 1987, was for a diminution in value. Michigan Millers had never received such a claim before and it is questionable whether such a claimed loss even constituted "property damages" under the policy. (See fn. 2, *ante.*) An additional coverage issue arose from the fact that earth movement or subsidence had apparently been concurrently caused by "third party negligence." This apparently was an *excluded* peril in all post-1983 policies. However, in earlier policies (that is, those in effect *prior to 1984*) third party negligence as a concurrent cause was *not* an excluded peril. ▬▬ ▬▬ These issues were neither trivial nor without arguable merit.[20] ▬▬ Michigan Millers acted within its rights, indeed its duty to its other policyholders and shareholders, to thoughtfully explore these matters.[21]

The evidence establishes beyond dispute that the coverage question was not resolved until November 18, 1987.[22] On that date, Michigan Millers, despite contrary legal advice, decided to recognize (1) the likelihood of ultimate actual observable property damage and (2) the fact that the damage to the general Bluff Cove area had been a long time in the making and doubtless had occurred, at least in significant part, during the earlier policy periods when the concurrent causation exclusionary language was not in effect. Therefore, Michigan Millers, on that date, decided to "honor the claim."

---

[20]Indeed, as the record reflects, Michigan Millers had before it on November 18, 1987, the written opinion of its legal counsel that it should deny coverage on this ground. An insurer's receipt of and reliance on such advice is a relevant circumstance to be considered on the issue of its alleged bad faith. (*State Farm Mut. Auto. Ins. Co.* v. *Superior Court* (1991) 228 Cal.App.3d 721, 725 [279 Cal.Rptr. 116].)

[21]We do not here need to determine the merits of the coverage issue raised by the language of Michigan Millers' post-1983 policies. We only note that, depending upon the policy language actually utilized and the facts as to the efficient proximate cause of plaintiffs' loss, an arguable question of coverage might well exist. (See *State Farm Fire & Casualty Co.* v. *Von Der Lieth* (1991) 54 Cal.3d 1123, 1134 [2 Cal.Rptr.2d 183, 820 P.2d 285]; cf. *Howell* v. *State Farm Fire & Casualty Co.* (1990) 218 Cal.App.3d 1446, 1452-1461 [267 Cal.Rptr. 708].) Thus, some consideration and evaluation of the issue, as well as the surrounding circumstances, by Michigan Millers would, at least on the record before us, appear to have been reasonable.

[22]Whether this issue should reasonably have been resolved at an earlier time or, for that matter, whether Michigan Millers raised and considered the issue in good faith are questions of fact to be resolved by the jury.

A further geology report was then requested by Zemel in order to justify a substantial payment to plaintiffs (including a possible policy limit settlement) even though the observable damage to their home was minor and very possibly not even due to the general landslide activity. This report was submitted to Zemel on or about December 23, 1987. On December 30, Zemel wrote to Michigan Millers and effectively recommended that a "policy limits" resolution of plaintiffs' claim be madè.

Even drawing every reasonable inference in plaintiffs' favor, we can not conclude that any evidence supports the jury's determination that Michigan Millers' 60-day payment obligation had commenced on July 30, 1987. Certainly, no decision or agreement to pay policy limits could reasonably be expected until Michigan Millers had an adequate opportunity to receive and consider expert geological advice as well as the advice of its legal counsel regarding the coverage issues. ■ Just what period of time was reasonably required to accomplish this is an issue of fact which we can not resolve. ■ We can only say that, given the evidence before us, the date selected by the jury (July 30, 1987) is clearly not supported.

As the entire compensatory damage was calculated from September 30, 1987 (i.e., 60 days after July 30, 1987), the award cannot stand. We will remand the matter back to the trial court for a new determination as to when, under the terms of the policy and all of the relevant facts and circumstances, the policy benefits should reasonably have been paid.

5. *The Trial Court Erroneously Instructed the Jury on Punitive Damages*

■ Punitive damages may be awarded under Civil Code section 3294.[23] That section was amended in 1987 to provide specific definitions for the terms "malice" and "oppression" which, if established by "clear and convincing evidence," would be sufficient to support a claim for punitive

---

[23]Civil Code section 3294 as amended in 1987, applies to all cases where the initial trial has not commenced prior to January 1, 1988. It provides in pertinent part:

"(a) In an action for the breach of an obligation not arising from contract, where it is proven by *clear and convincing evidence* that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) As used in this section, the following definitions shall apply:

"(1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff *or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.*

"(2) 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.

"(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ." (Italics added.)

damages. Michigan Millers contends that the trial court did not properly instruct the jury with respect to these critical new terms.

■ Evidence that an insurer has violated its duty of good faith and fair dealing does not thereby establish that it has acted with the requisite malice, oppression or fraud to justify an award of punitive damages. (See, *Travelers Ins. Co.* v. *Lesher* (1986) 187 Cal.App.3d 169, 200-202 [231 Cal.Rptr. 791]; *Patrick* v. *Maryland Casualty Co.* (1990) 217 Cal.App.3d 1566, 1575-1576 [267 Cal.Rptr. 24].) In order to establish that an insurer's conduct has gone sufficiently beyond mere bad faith to warrant a punitive award, it must be shown by *clear and convincing evidence* that the insurer has acted maliciously, oppressively or fraudulently. ■ In this case, plaintiffs sought to show this by reliance upon the same acts by Michigan Millers as support the breach of the implied covenant of good faith. They then asked the jury to draw the inference that Michigan Millers acted with malice and oppression. No claim of fraud was made; nor, for that matter, did plaintiffs claim that Michigan Millers acted with the intent to harm them.[24] Plaintiffs argued that punitive damages were justified because Michigan Millers, knowing the probable harmful consequences to plaintiffs, acted with a conscious disregard of their rights.

■ Even before the 1987 amendments, the courts articulated a standard for the proof of malice where, as here, no intent to harm is claimed. Such malice " 'implies an act conceived in a spirit of mischief or with criminal indifference towards the obligations owed to others.' [Citations.] In Dean Prosser's words: 'Where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award in the tort action "punitive" or "exemplary" damages. . . . [¶] Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, *or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton.*' [Citation.]" (*Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 894-895 [157 Cal.Rptr. 693, 598 P.2d 854], italics in *Taylor.*)

As another court put it, "The phrase *conscious disregard* is something used to describe the highly culpable state of mind which justifies an exemplary award." (*G.D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 32 [122 Cal.Rptr. 218].) The term is "an appropriate description of the *animus malus* which may justify an exemplary damage award when nondeliberate

---

[24]Plaintiffs do argue in their brief on appeal that Michigan Millers acted with such intent. However, that claim was not made in the trial court nor was the jury instructed on the point.

injury is alleged." (*Ibid.*; see also *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Fleming* v. *Safeco Ins. Co.* (1984) 160 Cal.App.3d 31, 43-44 [206 Cal.Rptr. 313].) "In order to justify an award of punitive damages on this basis, the plaintiff must establish that the defendant was aware of the probable dangerous consequences of his conduct, and that he wilfully and deliberately failed to avoid those consequences. [Citations.]" (*Taylor* v. *Superior Court, supra,* 24 Cal.3d at pp. 895-896.)[25]

■ What evidence was there here of Michigan Millers' conscious disregard of plaintiffs' rights? It could only be in the inferences which the jury might reasonably draw from the uncontradicted and undisputed evidence which we have previously summarized. On facts similar to those we have here, courts have reached different conclusions. (Cf., *Patrick* v. *Maryland Casualty Co., supra,* 217 Cal.App.3d 1566, 1576 and *Liberty Transport Inc.* v. *Harry W. Gorst Co.* (1991) 229 Cal.App.3d 417, 436-437 [280 Cal.Rptr. 159], disapproved on another point in *Adams* v. *Murakami* (1991) 54 Cal.3d 105, 116 [284 Cal.Rptr. 318, 813 P.2d 1348].) ■ However, a central theme common to those cases which have sustained punitive awards is the existence of *established policies or practices* in claims handling which are harmful to insureds. (See, e.g., *Moore* v. *American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 637 [197 Cal.Rptr. 878] [insurer had a practice "firmly grounded in established company policy" of intentionally supplying physicians with the wrong definition of total disability]; *Downey Savings & Loan Assoc.* v. *Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1098-1099 [234 Cal.Rptr. 835] [insurer was guilty of company-wide misconduct by instructing its claims adjusters to focus on ways to defeat claims]; *Hughes* v. *Blue Cross of Northern California* (1989) 215 Cal.App.3d 832, 847 [263 Cal.Rptr. 850] [insurer's objectionable claims handling practices were rooted in *established* company practice]; *Liberty Transport Inc.* v. *Harry W. Gorst Co., supra,* 229 Cal.App.3d 417, 436-437 [insurer had a *company policy* of never communicating directly with their insureds and despite knowledge of insured's ignorance of decision to deny claim did nothing to correct the error].) In *Patrick* v. *Maryland Casualty Co., supra,* the court seemed to suggest that what was required was "a consistent and unremedied pattern of egregious insurer practices" (217 Cal.App.3d at p. 1576) in order for the insurer's "bad faith" conduct to rise to the level of malicious disregard of the insured's rights so as to warrant the imposition of punitive damages.

[25]It should be noted that a number of the reported decisions arose in a factual context where the plaintiff suffered a physical, as opposed to an economic, injury; thus the reference to the term "safety of others" or probable "dangerous" consequences. We see no logical reason not to recognize that the term "safety of others" is the equivalent of "rights of others" and the term "dangerous" could also be read as "harmful." (See *G.D. Searle & Co.* v. *Superior Court, supra,* 49 Cal.App.3d at p. 32.)

Here, there was no evidence of an *established* insurer practice of ignoring an insured's claim or subsequent inquiries about it. Indeed, plaintiffs' repeated assertion that four letters of inquiry went unanswered ignores the undisputed evidence that Michigan Millers' appointed adjuster attempted to respond to at least two of them by telephone. There was a delay in the conclusion of plaintiffs' claim. Clearly, Michigan Millers did a poor job of keeping the plaintiffs and their attorney informed as to the progress of their evaluation of the geological and coverage issues. The evidence is obviously sufficient to support the jury's conclusion that the delay was unreasonable, as were the self-serving conditions imposed upon payment. But did this conduct rise to the level of malicious disregard, or was it simply evidence of, in the words of the *Patrick* court, "inept and negligent handling of a claim" (217 Cal.App.3d at p. 1576)? The answer depends upon what reasonable inferences the jury draws from its review of all of the evidence. However, that answer is neither clear nor obvious to this court. Plaintiffs' case for punitive damages is not a strong one. The evidence, in our view, will support inferences going either way. As in those cases with sharply conflicting evidence, it is a very close call.

The jury's decision on this issue was required to be made not just under the rigorous definition of malice discussed above, but also under the increased statutory burden imposed by the 1987 amendment. By that statutory change, plaintiffs were also required to prove, by clear and convincing evidence, that Michigan Millers had engaged in *despicable conduct* which was carried on in wilful and conscious disregard of their rights.

The jury, which had been instructed on both malice and oppression as grounds for a punitive damage award, accepted plaintiffs' arguments with respect to malice but concluded that Michigan Millers had *not* acted oppressively. However, the jury reached these conclusions on instructions which are at significant variance with what the law requires. Under Civil Code section 3294, malice is defined as either (1) conduct which is intended by the defendant to cause injury to the plaintiff or (2) "*despicable conduct* which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Italics added.)

As plaintiffs made no claim or contention that Michigan Millers had acted with the *intent* to harm them, they were required to prove to the jury that Michigan Millers had engaged in "despicable conduct" carried on with a willful and conscious disregard of their rights. Yet, the court's instruction did not require the jury to find despicable conduct. It was told:

" 'Malice' means conduct which is carried on by the Defendant with a willful and conscious disregard for the rights of others. An insurance company acts with conscious disregard of the rights of others when it is aware of

the probable harmful consequences of its conduct and willfully and deliberately fails to avoid those consequences."

■■■ No mention is made of the term "despicable conduct" in connection with the "malice" requirement. The instruction given would have been perfectly proper for a case tried prior to the effective date of the 1987 amendment. (See, e.g., *Travelers Ins. Co.* v. *Lesher, supra*, 187 Cal.App.3d at pp. 200-201.) However, we cannot assume that the Legislature did not intend to make an important change by its addition of the requirement of "despicable conduct" as an alternative, in the proof of malice, to conduct which is *intended* to cause injury. In order for us to disregard this change we would have to ignore the well established rule of statutory construction which mandates that significance be given, if possible, to every word, phrase, sentence and part of a legislative enactment. (*DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 17-18 [194 Cal.Rptr. 722].)

While the Legislature made no effort to define the term "despicable conduct," that does not mean it is without significant meaning or that the evidentiary burden necessary to obtain punitive damages is not substantially heavier. Not only must despicable conduct be established, it must be proven by clear and convincing evidence. In our view, the Legislature clearly intended, by these changes, to impose a new statutory limitation on the award of punitive damages. BAJI No. 14.72.1 (1989 rev.) proposes a definitional instruction which appears to recognize this point:

" 'Despicable conduct' is conduct which is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people."

■■■ The trial court's failure to include this important term in its instructions on malice was error. Significantly, it did include the term in its instruction on oppression,[26] but only defined the term as conduct which is "vile, base or contemptible." The standard included in the BAJI instruction by which the jury might judge such conduct was omitted. Even so, the jury rejected the conclusion that Michigan Millers' conduct amounted to oppression. Thus, in the one instruction where the jury *was* required to find despicable conduct it refused to do so.

The trial court compounded the instructional error by a second instruction which mischaracterized the nonintentional conduct of Michigan Millers which would be sufficient to establish malice. The court told the jury, at

[26]The instruction on oppression was taken verbatim from the statutory language in Civil Code section 3294, subdivision (c). (See fn. 23, *ante*.)

plaintiffs' request and as part of the instruction relating to a defendant's actions in "conscious disregard of the rights of others," that:

"Non-intentional conduct comes within the definition of malicious acts punishable by the assessment of punitive damages when a party performs an act which he knows, or should know, is highly probable to cause damage to another."

This was an erroneous statement as the trial judge clearly recognized.[27] Not only is it based upon authorities which preceded the 1987 amendment to Civil Code section 3294, but it misstates their import.[28] Moreover, given the burden of the new statutory requirements for punitive liability on which the court did not instruct the jury, the instruction was very confusing and misleading.

■■■ Finally, Michigan Millers argues that the court erred in its instruction on "clear and convincing evidence." There can be no liability for punitive damages except where the existence of malice, oppression or fraud is established by *clear and convincing* evidence. (Civ. Code, § 3294, subd. (a).) This increased burden of proof was also added by the 1987 amendment. As was the case with despicable conduct, the Legislature did not include a definition. However, extant case law is of considerable help.

■■■ We recently had occasion to review the cases which have defined this term and we noted that our Supreme Court had "described this standard by saying that ' "Clear and convincing" evidence requires a finding of high probability. This standard is not new. We described such a test, 80 years ago, as requiring that the evidence be " 'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " (*Sheehan* v. *Sullivan* (1899) 126 Cal. 189, 193 . . . .) It retains validity today. [Citation.]' (*In re Angelia P.* (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198].) This characterization has been repeated and applied in many cases. [Citations.]" (*In re Marriage of Weaver* (1990) 224 Cal.App.3d 478, 487 [273 Cal.Rptr. 696]; see also *In re David C.* (1984) 152 Cal.App.3d 1189, 1208 [200 Cal.Rptr. 115].) These cases make it clear that

[27]In the afternoon prior to reading the instructions to the jury, the trial judge met with counsel. Michigan Millers specifically objected to this instruction on the ground that it misstated the law and was confusing. The judge responded, "I agree with you. It is at variance with the law. I won't give it." Nonetheless, and without further explanation, the instruction *was* read to the jury.

[28]The case cited by plaintiffs as authority for this erroneous instruction does not support it. See the pre-1987 amendment discussion of nonintentional conduct as a basis for punitive damages in *Nolin* v. *National Convenience Stores, Inc.* (1979) 95 Cal.App.3d 279, 284-288 [157 Cal.Rptr. 32].

a new higher quantum of proof is required. However, the jury *was* so instructed and Michigan Millers is in no position to claim that the instruction as given was erroneous.[29]

We therefore reject its argument as to the adequacy of the clear and convincing instruction. However, given the erroneous definition of malice, the jury was not provided with sufficient guidance to determine if the requisite quantum of proof was present.[30]

### 6. *Michigan Millers Is Entitled to Raise the Issue of Erroneous Instructions on Appeal*

 Plaintiffs argue that if Michigan Millers regarded these instructional errors as so significant it should have drawn the court's attention to them during the chambers discussions on the proposed jury instructions. The record before us[31] reflects that with respect to the two principal instructional errors which we have described above, Michigan Millers made an objection to only one (plaintiffs' proposed instruction on nonintentional conduct).[32] However, given the manifest error of these two instructions, especially when considered together, such objections or comment by Michigan Millers were not required.

Code of Civil Procedure section 647 provides, in pertinent part, that the trial court's ". . . giving an instruction, refusing to give an instruction, or modifying an instruction requested . . . [are] deemed to have been excepted to." This section obviated the need on Michigan Millers' part to assert any objection to the two erroneous malice instructions given by the trial court. A

---

[29]In this case, the court instructed the jury in accordance with BAJI No. 2.62 which provides: " 'Clear and convincing' evidence means evidence of such convincing force that it demonstrates, in contrast to the opposing evidence, a high probability of the truth of the facts for which it is offered as proof. Such evidence requires a higher standard of proof than proof by a preponderance of evidence." While we have previously criticized the adequacy of this instruction (see *In re Marriage of Weaver, supra*, 224 Cal.App.3d at p. 487, fn. 8) we cannot conclude that it was error to give it in the absence of a request by Michigan Millers for a different instruction. (*Roberts* v. *Ford Aerospace & Communications Corp.* (1990) 224 Cal.App.3d 793, 804 [274 Cal.Rptr. 139].)

[30]We need not address here the due process arguments raised by Michigan Millers. First, our resolution of this matter will result in a new trial as to punitive damages and so the issue is premature. Second, the issue of whether California has constitutionally sufficient objective criteria by which the amount of punitive awards may be tested in postjudgment proceedings is apparently an open question which the Supreme Court has reserved. (*Adams* v. *Murakami, supra*, 54 Cal.3d 105, 118-119, fn. 9.)

[31]The issue of possible waiver of instructional error was raised by us at oral argument and the parties were given an opportunity to address the point at that time and in postargument letter briefs which we have received and considered.

[32]As we have already pointed out, this objection was sustained by the court, but the instruction was read to the jury anyway.

common misapprehension about the application of section 647 was clarified by the Supreme Court in *Agarwal v. Johnson* (1979) 25 Cal.3d 932 [160 Cal.Rptr. 141, 603 P.2d 58], ". . . [I]t is settled that a party may not complain on appeal that an instruction *correct in law* is too general or incomplete unless he had requested an additional or qualifying instruction. [Citations.][33] [¶] However, it is equally well settled [that a party is] deemed to have excepted to every instruction given and [is] therefore not barred by [his] failure to offer an alternative instruction from asserting error in the instruction as given. [Citations.] The distinction between these two propositions was discussed in *Rivera v. Parma* (1960) 54 Cal.2d 313, 316 [5 Cal.Rptr. 665, 353 P.2d 273]: ' "To hold that it is the duty of a party to correct the errors of his adversary's instructions . . . would be in contravention of section 647, Code of Civil Procedure, which gives a party an exception to instructions that are given . . . . While the exception will be of no avail where an instruction states the law correctly but is 'deficient merely by reason of generality,' in other cases he will not be foreclosed from claiming error and prejudice." ' " (25 Cal.3d at pp. 948-949.) (Italics added.)

As one court noted, in applying Code of Civil Procedure section 647, "Defendants have been unable to cite any case directly holding that a party who fails to object to an erroneous instruction proposed by his adversary or to propose a correct instruction of his own on the same subject is precluded on appeal from complaining of the giving of the improper instruction. While plaintiff might have been able to avoid the necessity for an appeal by taking such steps, her failure to do so did not constitute a waiver of her right to contend on appeal that the instructions given at defendants' request were prejudicially erroneous. It is settled that the giving of an instruction shall be deemed excepted to, even though the party complaining on appeal made no objection thereto in the trial court. [Citations.]" (*Enis v. Specialty Auto Sales* (1978) 83 Cal.App.3d 928, 939-940 [148 Cal.Rptr. 255]; see also *Pappert v. San Diego Gas & Electric Co.* (1982) 137 Cal.App.3d 205, 212 [186 Cal.Rptr. 847]; *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 406-407 [264 Cal.Rptr. 779]; *U.S. Roofing, Inc. v. Credit Alliance Corp.* (1991) 228 Cal.App.3d 1431, 1446-1447 [279 Cal.Rptr. 533].)

Thus, Michigan Millers is not precluded from asserting the error of the instructions given by the trial court with respect to malice and nonintentional conduct. These instructions, whether viewed singly or together, clearly misstate the law. The final question which remains for us to resolve is whether such erroneous instructions were so prejudicial as to require reversal.

---

[33]It is for this reason that we have refused to consider Michigan Millers' objection to the instruction on "clear and convincing evidence." (See fn. 29, *ante.*)

### 7. *The Erroneous Instructions Were Clearly Prejudicial to Michigan Millers*

As we have noted, there is substantial evidence in the record to support reasonable inferences by the jury that Michigan Millers' delay in paying policy benefits to the plaintiffs was unreasonable, and therefore a breach of the implied covenant of good faith occurred. However, as we have likewise noted, the same cannot be so easily said of the evidence of malice. It is in this context that we examine the issue of the prejudicial nature of the erroneous instructions.

 "Article VI, section 13 of the California Constitution provides that error in instructing the jury shall be grounds for reversal only when the reviewing court, 'after an examination of the entire cause, including the evidence,' concludes that the error 'has resulted in a miscarriage of justice.' The test of reversible error has been stated in terms of the likelihood that the improper instruction misled the jury. [Citation.]" (*Weiner* v. *Fleischman*, *supra*, 54 Cal.3d 476, 490; *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1054 [1 Cal.Rptr.2d 913, 819 P.2d 872].) Thus, if a review of the entire record demonstrates that the improper instruction was so likely to have misled the jury as to become a factor in the verdict, it is prejudicial and a ground for reversal. (*Henderson* v. *Harnischfeger Corp.*, *supra*, 12 Cal.3d 663, 670.) "To put it another way, '[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction prejudice appears and this court "should not speculate upon the basis of the verdict" ' [Citations.]" (*Id.* at p. 670.)

"The determination whether, in a specific instance, the probable effect of the instruction has been to mislead the jury and whether the error has been prejudicial so as to require reversal *depends on all of the circumstances of the case*, including the evidence and the other instructions given. No precise formula can be drawn." (*Butigan* v. *Yellow Cab Co.* (1958) 49 Cal.2d 652, 660-661 [320 P.2d 500, 65 A.L.R.2d 1], italics added; *Mitchell* v. *Gonzales*, *supra*, 54 Cal.3d at p. 1054.) Among the factors which are considered are (1) the degree of conflict in the evidence on critical issues and (2) the effect of other instructions in remedying the error. (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].)[34]

We read the phrase "conflict in the evidence" as another way of describing the closeness of a case. This case, as we have pointed out, was extremely

---

[34]The Supreme Court in *LeMons* outlined five separate factors which should be considered, in order to measure the likelihood of whether the jury has been misled: "(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the

close. Indeed, it is only by *inferences* from the undisputed evidence that a jury could justify any finding of malice. However, reasonable inferences could just as well be drawn which favor Michigan Millers. This would be particularly true when the more exacting standard for malice (based on nonintentional conduct) imposed by the 1987 legislative amendment, is applied. The requirement that the jury find "despicable conduct" on the part of Michigan Millers is no small or trivial matter. The jury was told that they were required to so find in order to conclude that Michigan Millers was guilty of oppression. They declined to reach that conclusion. Plaintiffs dismiss this with the argument that the jury probably could not find *some other* element of oppression. That may be so, but we may not, in determining the issue of prejudice to Michigan Millers, engage in such speculation. (*Robinson* v. *Cable* (1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929].) We can only note that such a result appears to be strong evidence of the reasonable likelihood that the failure to properly instruct on the new statutory requirements of malice did in fact mislead the jury.

Finally, a review of all of the instructions fails to disclose any which corrected the error. Indeed, the inclusion of "despicable conduct" in the oppression instruction, combined with its absence from the malice instruction, essentially reinforced the probable jury conclusion that malice did not require such a rigorous test. This was aggravated by the other erroneous instruction on malice which admittedly misstated the law applicable to a defendant's nonintentional conduct. In short, not only did other instructions fail to correct the error, they acted in a synergistic fashion to compound it.

 As we have already stated, we do not view the evidence and the inferences to be drawn therefrom in plaintiffs' favor when evaluating the possible prejudice resulting from improper jury instructions. (*Henderson* v.

---

jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations]." (21 Cal.3d at p. 876.)

We focus here on factors (1) and (5) because they were clearly and definitively involved. In the sense that the improper instruction left out something critical, respondents' argument to the jury simply had no occasion to address the issue of the increased statutory burden of malice although the presence of "despicable conduct" was certainly urged as it *was* included in the instruction on oppression; thus factor (2) is not seriously implicated. There was no request to reread instructions, but we note that the written jury instructions were given to the jury to use during their deliberations; thus, factor (3) played no part. Finally, factor (4) was only marginally implicated as the jury's verdict was 10 to 2 on the liability and the malice issues. However, we do not read *LeMons* as providing an exclusive list of relevant factors or requiring that all five necessarily be dispositively involved. As the Supreme Court recently reemphasized, there is no precise formula and the *LeMons* factors are a valid guide (*Weiner* v. *Fleischman, supra*, 54 Cal.3d at p. 490; *Mitchell* v. *Gonzales, supra*, 54 Cal.3d at p. 1054); we are still required to consider the appellate record as a whole. (*Butigan* v. *Yellow Cab Co., supra*, 49 Cal.2d at pp. 660-661.)

*Harnischfeger, supra,* 12 Cal.3d at p. 674.) We are compelled to assume that had the trial court properly defined malice as required by the statute the jury might well have reached a different result.

The evidence demonstrated that Michigan Millers took over a year to pay the policy limits after receiving the original notification of plaintiffs' claim. Yet several months of that time period were consumed in order to (1) get access to the property (a delay caused by plaintiffs' voluntary absence), (2) receive and consider two geological reports and (3) evaluate the clearly arguable issues presented on the question of coverage. The total delay was ultimately unreasonable, but it was not necessarily the result of any "evil motive" or in a conscious disregard of the consequences to plaintiffs. Indeed, it does not appear that there were any adverse collateral consequences to plaintiffs. There was simply a delay in the payment of money.[35]

The failure of Michigan Millers to adequately communicate with plaintiffs, while found to be unreasonable, might certainly be considered, upon proper instructions, to be something less than "despicable."

Plaintiffs' argument to the jury that Michigan Millers was pursuing delaying tactics in order to cause the policy's contractual limitations period to run out is without factual support and does not track with the applicable law. Indeed, the contention was based on nothing but argument. There was not one shred of evidence that Michigan Millers had any such motive or had ever asserted such a defense or that the matter had even been discussed. As to the question of the argument's legal justification, the Supreme Court pointed out in *Prudential-LMI Commercial Insurance* v. *Superior Court* (1990) 51 Cal.3d 674 [274 Cal.Rptr. 387, 798 P.2d 1230], the one-year contractual limitations period is tolled from the date the claim is filed until the claim is formally denied. (*Id.* at p. 693.) There is no question that plaintiffs filed their claim in a timely manner and Michigan Millers never denied it. Thus, as a matter of law, the running of the limitations period was tolled during the entire period relevant to this dispute. The endorsement of this tolling rule by *Prudential-LMI* was merely declarative of existing law

---

[35]It is clear from the record that there were no adverse consequences to plaintiffs other than a delay in receiving payment for which they are entitled to be compensated at a significant rate of interest. There were no repairs that needed to be made, no emergency condition that threatened to or did become worse due to the delay in payment and no exigent circumstances that threatened the plaintiffs with physical harm or further property loss if prompt payment were not made. Plaintiffs concede in their brief on appeal that they "were not depending upon the policy benefits to correct the damage." Although asserted in their complaint as a basis for $1 million in damages, plaintiffs offered no evidence of any emotional distress caused by the delay. In fact, when, during argument to the jury, plaintiffs' counsel stated, "This case has been a nightmare for Mr. and Mrs. Mock," the court immediately sustained an objection on the ground there was no evidence to support such statement.

and therefore has retrospective application. (*San Jose Crane & Rigging, Inc. v. Lexington Ins. Co.* (1991) 227 Cal.App.3d 1314, 1320-1321 [278 Cal.Rptr. 301].)

Plaintiffs claim that Michigan Millers' refusal to renew the existing policy was evidence of its evil motive. Yet, an insurer is always free to refuse to incur an unacceptable risk and Michigan Millers was under no obligation to renew the policy. Indeed, "an insurer has no legal duty to renew an insurance policy when its term has expired" (*Travelers Ins. Co.* v. *Lesher, supra,* 187 Cal.App.3d at p. 194); even a bad faith claim ordinarily cannot be based upon an insurer's nonrenewal decision. (*Id.* at p. 194.) Moreover, given the admitted condition of plaintiffs' property it would seem that the jury could reasonably conclude that Michigan Millers' decision not to renew was a prudent business judgment rather than an attempt, as plaintiffs argued, to pressure the plaintiffs into accepting a lesser sum in settlement. The record discloses no evidence that Michigan Millers ever attempted to negotiate a settlement of less than the policy limits.

 Finally, plaintiffs claim that Michigan Millers was only motivated by a desire to protect its own subrogation interests at the expense of plaintiffs. There is certainly evidence of this, but whether Michigan Millers' efforts to protect its subrogation claim rose to the level of despicable conduct is open to reasonable argument. The same can be said for plaintiffs' contention that Michigan Millers improperly asked for unnecessary documentation and forced plaintiffs to file and prosecute a lawsuit. Inferences can reasonably be drawn from this evidence which clearly support the basic tort liability for "bad faith." But again, is this sufficient to establish despicable conduct? Reasonable minds could differ; they could well conclude that Michigan Millers was, in the words of the court in *Patrick* v. *Maryland Casualty Co., supra,* simply guilty of the "inept and negligent handling of a claim." (217 Cal.App.3d at p. 1576.)[36]

When a jury is presented with such a close case and then is misinstructed (1) as to the definition and standards for malice and (2) as to the circumstances under which nonintentional conduct may constitute malicious behavior, the result is surely prejudicial to the aggrieved defendant. We are presented here with multiple misstatements of the law which could only have had a synergistic effect. The interplay of these instructions is such that it was

---

[36]As we conclude that the jury, *if properly instructed,* could also have reasonably drawn an inference of malice, there is no merit to the final contention of Michigan Millers that substantial evidence on that issue was not presented by plaintiffs. As we have repeatedly stated, this was a close case and the issue could have been resolved *either* way. We therefore reject and do not discuss further Michigan Millers' argument as to the lack of any evidentiary support for punitive damages.

very probable that the jury was misled as to the proper way to determine if malice was present. As the jury's finding of malice is the only basis for its award of punitive damages, this is sufficient to establish prejudice and to warrant reversal. (*Henderson* v. *Harnischfeger Corp.*, *supra*, 12 Cal.3d at p. 670; see also, *Continental Airlines, Inc.* v. *McDonnell Douglas Corp.*, *supra*, 216 Cal.App.3d 388, 407-408.)

## CONCLUSION

We conclude that the judgment must be reversed and returned to the trial court for a new trial as to (1) the amount of compensatory damages and (2) the liability for and amount of punitive damages.

## DISPOSITION

The judgment is reversed and remanded to the trial court for further proceedings in accordance with the views expressed herein. Michigan Millers shall recover its costs on appeal.

Danielson, Acting P. J., and Hinz, J., concurred.